UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEARL RIVER UNION FREE SCHOOL DISTRICT,

                Plaintiff,

    -v-

ARNE DUNCAN, as SECRETARY OF THE
DEPARTMENT OF EDUCATION, and UNITED
STATES DEPARTMENT OF EDUCATION,
OFFICE FOR CIVIL RIGHTS,

                Defendants.

Case No. 12-CV-2938 (KMK)

OPINION AND ORDER

Appearances:

Mark Craig Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Plaintiff*

Jennifer Ellen Blain, Esq.
United States Attorney's Office
Southern District of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff Pearl River Union Free School District ("Plaintiff") brings this Action against

Defendants Arne Duncan, as Secretary of the United States Department of Education, and the

United States Department of Education's Office for Civil Rights ("OCR") (collectively,

"Defendants"), alleging that OCR's issuance of a Letter of Findings setting forth its

determinations in regard to an alleged incident of racial harassment was arbitrary and capricious,

in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("the APA"), and

deprived Plaintiff of both procedural and substantive due process, in violation of the Fifth

Amendment to the United States Constitution.  Defendants move to dismiss Plaintiff's APA and

Fifth Amendment claims on the ground that Plaintiff lacks standing to assert them.  Defendants

also move to dismiss Plaintiff's APA claims on the ground that the APA bars their review by this

Court, as OCR's issuance of the Letter of Findings was not final agency action.  For the

following reasons, Defendants' Motion To Dismiss is granted.

## I.  BACKGROUND

### A.  Factual Background

The following facts are taken from the allegations contained in Plaintiff's Amended

Complaint, which allegations the Court accepts as true for the purpose of deciding Defendants'

Motion to Dismiss.  On February 23, 2011, OCR received a complaint against Plaintiff, in which

the complainant "alleged . . . that [Plaintiff] discriminated against her son . . . , a student at

Ardsley High School and a member of the Ardsley [High School] basketball team, on the basis

of his race."  (Am. Compl. ¶¶ 6–7 (Dkt. No. 20).)  Specifically, the complainant alleged that

Plaintiff "failed to appropriately respond to an incident of racial harassment which allegedly

occurred" approximately one week earlier, on February 18, 2011, "at a basketball game played at

Pearl River High School between the Pearl River High School team and the Ardsley High

School team," at which "a spectator alleged[ly] yelled a racial slur as the [complainant's son]

came onto the basketball court to play in the game."  (*Id.* ¶ 7.)

In response, Plaintiff conducted what it describes in its Amended Complaint as "a prompt

and comprehensive investigation into the allegations made by the [c]omplainant," "which

included [Plaintiff] interviewing 31 witnesses and viewing a video recording of the basketball

game."  (*Id.* ¶ 8.)  These 31 interviewees included students, staff, and coaches from within the

school district, as well as staff from Ardsley High School, the referees from the game, and other

members of the community.  (*Id.*)  However, according to Plaintiff, its "investigation revealed no credible evidence suggesting that an incident of racial harassment had occurred," as "[n]one of the witnesses heard the alleged racial slur uttered, and the slur could not be detected on the video recording of the basketball game."  (*Id.* ¶ 9.)

On March 10, 2011, OCR notified Plaintiff by letter that "it was opening an investigation regarding [the complainant's] allegation" "in accordance with its duties to enforce Title VI of the Civil Rights Act of 1964 . . . and its implementing regulation[s] . . . , which prohibit discrimination on the basis of race, color or national origin in programs and activities receiving financial assistance from the U.S. Department of Education."  (*Id.* ¶ 10.)  Plaintiff reproduced portions of that letter in its Amended Complaint:

> Please note that opening the allegation for investigation in no way implies that OCR has made a determination with regard to its merits.  During the investigation, OCR is a neutral fact-finder, collecting and analyzing relevant evidence from the complainant, the recipient, and other sources, as appropriate.  OCR will ensure that its investigation is legally sufficient and is dispositive of the allegations, in accordance with the provisions of Article III of OCR's *Case Processing Manual*.
> . . . .
>
> Also, when appropriate, a complaint may be resolved before the conclusion of investigation after the recipient expresses an interest to OCR to resolve the complaint.  In such cases, OCR obtains a resolution agreement signed by the recipient.  This agreement must be aligned with the complaint allegations or the information obtained during the investigation, and it must be consistent with applicable regulations.

(*Id.* (emphasis removed).)

OCR also provided Plaintiff with "a copy of the OCR Complaint Processing Procedures," from which much of the language from OCR's March 10 letter appears to have been drawn:

> A complaint may also be resolved before the conclusion of the investigation, if the recipient expresses an interest in resolving the complaint.  If OCR determines that the resolution of the complaint before the conclusion of the investigation is appropriate, OCR will attempt to negotiate an agreement with the recipient.  OCR

3

will notify the complainant of the recipient's request of the complaint and will keep the complainant informed throughout all stages of the resolution process. The provisions of the resolution agreement that is reached must be aligned with the complaint allegations and the information obtained during the investigation, and must be consistent with applicable regulations. A resolution agreement reached before the conclusion of the investigation will be monitored by OCR.

(*Id.* ¶ 11 (emphasis removed).)

The Complaint Processing Procedures also state the following:

If OCR determines that a recipient failed to comply with one of the civil rights laws that OCR enforces, OCR will contact the recipient and will attempt to secure the recipient's willingness to negotiate a voluntary resolution agreement. If the recipient agrees to resolve the complaint, the recipient will negotiate and sign a written resolution agreement that describes the specific remedial action that recipient will undertake to address the area(s) of noncompliance identified by OCR. The terms of the resolution agreement, if fully performed, will remedy the identified violation(s) in compliance with applicable civil rights laws. OCR will monitor the recipient's implementation of the terms of the resolution agreement to verify that the remedial actions agreed to by the recipient have been implemented consistent with the terms of the agreement and that the area(s) of noncompliance identified were resolve [sic] consistent with applicable civil rights laws.

If the recipient refuses to negotiate a voluntary resolution agreement or does not immediately indicate its willingness to negotiate, OCR will inform the recipient that it has 30 days to indicate its willingness to engage in negotiations to voluntarily resolve identified areas of noncompliance, or OCR will issue a Letter of Findings to the parties providing the factual and legal bases for a finding noncompliance [sic].

(*Id.* ¶ 13 (emphasis removed).)

After receiving the March 10, 2011 letter, Plaintiff contacted OCR Compliance Team Investigator Geraldo Perez ("Mr. Perez"), in order "to express [Plaintiff's] interest in resolving the complaint through execution of a resolution agreement in accordance with Sections 302 and 304 of the OCR Case Processing Manual" ("the CPM"). (*Id.* ¶ 14 (emphasis removed).) Plaintiff noted that its "interest in resolving the complaint through execution of a resolution agreement" was "notwithstanding its strong belief that its comprehensive investigation yielded no credible evidence suggesting that the alleged incident occurred." (*Id.* ¶ 15.)

4

Section 302, the first section of the CPM that Plaintiff cited, reads in part as follows:

A complaint may be resolved at any time when, before the conclusion of an investigation, the recipient expresses an interest in resolving the complaint. OCR should inform the recipient that this process is voluntary. OCR's determination that it is appropriate to resolve the complaint during the course of an investigation must be approved by the Office Director or designee. If approved, OCR will immediately notify the complainant of the recipient's interest in resolving the complaint and will keep the complainant informed throughout all stages of this resolution process. The provisions of the resolution agreement will be aligned with the complaint allegations or the information obtained during the investigation, and will be consistent with applicable regulations. A copy of the resolution agreement will be included with the resolution letter. Resolution letters and agreements must be approved by the Chief Attorney or designee and the Office Director or designee, in consultation with the Enforcement Director.

(*Id.* ¶ 17.)[1]

Section 304, the second such section, includes the following language:

The complaint will be considered resolved and the recipient deemed compliant if the recipient enters into an agreement that, fully performed, will remedy the complaint (pursuant to Section 302) or identified violations (pursuant to Section 303). A copy of the agreement will be included with the resolution letter (if obtained during the investigation, pursuant to Section 302) or letter of finding(s) (if obtained after a compliance determination is made at the end of the investigation, pursuant to Section 303). Resolution agreement planning will be documented in the case file either separately or by reference to the resolution agreement.

(*Id.* ¶ 18 (emphasis removed).)

On September 29, 2011, Plaintiff "forwarded to all three OCR team members [who] had been involved in the matter as of that date," including Mr. Perez, Compliance Team Attorney Raghavan Pranita ("Ms. Pranita"), and Compliance Team Leader Erin Gimbel ("Ms. Gimbel"), "a proposed copy of the proposed resolution agreement." (*Id.* ¶ 19.) In the same email, Plaintiff also "challenged a statement made by Ms. [sic] Perez to the effect that [Plaintiff's]

---

[1] The current version of the CPM is available in its entirety at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html. Throughout this Opinion, where relevant, the Court will cite to the CPM itself, not the

Superintendent of Schools Dr. Auriemma [("Dr. Auriemma")] had allegedly stated that three

adults had communicated to him that they had heard a racial slur at the . . . basketball game."

(*Id.*)  Plaintiff informed OCR that Dr. Auriemma "had advised that he had never made any such

statement and that such communications to him had, in fact, not occurred."  (*Id.*)  Later that same

day, Ms. Gimbel advised Plantiff "that OCR's notes from its interview of Dr. Auriemma would

be reviewed."  (*Id.* ¶ 20.)  In response, in a second email to OCR, Plaintiff "noted that

[Plaintiff's] Board of Education felt strongly that [Plaintiff] had done nothing wrong and was not

prepared to agree to take action that would send a message that [Plaintiff] acknowledged having

done anything wrong and made clear that [Plaintiff] would like to 'cooperatively resolve this

matter.'"  (*Id.* ¶ 21.)

Plaintiff and OCR eventually entered into a Resolution Agreement on November 15,

2011, "whereby [OCR] and [Plaintiff] agreed to 'resolve the compliance concerns' regarding the

complaint."  (*Id.* ¶ 22.)  Pursuant to the Resolution Agreement, Plaintiff "assure[d] [OCR] that it

[would] take the actions detailed below":

> By November 30, 2011, [Plaintiff] will conduct further investigation to determine
> the source of the alleged racial slur made during the basketball game on February 18,
> 2011; including but not limited to, attempting to interview the complainant, the
> [complainant's son], and other witnesses identified by the complainant and the
> [complainant's son], and interviewing at least five additional student witnesses who
> were located in or near [Plaintiff's] student section during the game.   If the
> investigation reveals the identity of the alleged harasser(s), [Plaintiff] will take
> prompt and effective steps reasonably calculated to end the harassment, and prevent
> the harassment from recurring.   [Plaintiff] will notify the complainant of the
> outcome.
>
> . . . .   By December 15, 2011, [Plaintiff] will provide OCR with a copy of the
> investigative report, including a description of any action taken if the investigation
> reveals the identity of the alleged harasser(s).   Additionally, [Plaintiff] will provide
> OCR with documentation demonstrating that [Plaintiff] notified the complainant of
> the outcome of the investigation.
> . . . .

By December 14, 2011, [Plaintiff] will review and revise, as necessary, its harassment policy and related grievance procedures to address complaints of harassment based on race, color and national origin.  These procedures will provide for the prompt and equitable resolution of complaints of harassment based on race, color and national origin.  The procedures will include at a minimum [a number of requirements described in the Resolution Agreement.]

. . . .

Once revised, [Plaintiff] will utilize its on-going training programs that raise awareness of the issue of harassment for staff and students, to ensure that staff and students are aware of these revised policies and procedures and the prohibition against racial harassment.

. . . .

By December 14, 2011, [Plaintiff] will provide its revised harassment policy and any related grievance procedures to OCR for review and concurrence.

Within fifteen (15) days of [Plaintiff's] receipt of OCR's concurrence with respect to the revised policy and any grievance procedures, [Plaintiff] will provide OCR with documentation to substantiate that it has formally adopted the revised policy and procedures; updated its printed publications and on-line publications with the revised policy and procedures (inserts may be used pending reprinting of these publications in the 2012–13 school year); electronically disseminated the revised policy and grievance procedures to those high school students, parents, and . . . staff that [Plaintiff] has e-mails for, and mailed copies of the revised Code of Conduct pages to high school parents.  This documentation will include at a minimum (i) printouts or a link to all on-line publications containing the revised policy and grievance procedures; (ii) evidence of the electronic dissemination of the revised policy and grievance procedures to high school students, parents and . . . staff, as described [in the Resolution Agreement]; and (iii) if not yet finalized, copies of inserts for printed publications.

By January 1, 2012, [Plaintiff] will provide to OCR copies of the printed versions of all publications disseminated to high school students, parents, and . . . staff containing the revised policy and grievance procedures.

(Resolution Agreement (Nov. 15, 2011) ("Resolution Agreement") 1–3.)[2]

---

[2] The language described above is taken directly from the Resolution Agreement, as opposed to Plaintiff's Amended Complaint, the latter which summarizes, but does not quote verbatim from, the former.  (*See* Am. Compl. ¶ 26.)  "In ruling on a 12(b)(6) motion, . . . a court may consider the complaint as well as . . . any statements or documents incorporated in it by reference." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014).  Indeed, "[i]f a document relied on in the complaint contradicts

The Resolution Agreement further provided that Plaintiff "understands that OCR will not close the monitoring of this agreement until OCR determines that the recipient has fulfilled the terms of this agreement and is in compliance with the regulation . . . at issue in this case"; that Plaintiff "understands that by signing this agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this agreement"; and that "during the monitoring of this agreement, if necessary, OCR may visit [Plaintiff], interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether [Plaintiff] has fulfilled the terms of this agreement and is in compliance with the regulation . . . at issue in this case." (*Id.* at 3.) Importantly, the Resolution Agreement also stated that its execution "does not constitute an admission that [Plaintiff] has committed any violation of Title VI or its implementing regulations. Nor does execution of this Resolution Agreement constitute any admission of other wrongdoing by [Plaintiff]." (*Id.*)

The events giving rise to the instant Action took place two days after the Resolution Agreement was executed. On November 17, 2011, OCR "notif[ied] [Plaintiff] of the

---

allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Rothstein v. GMAC Mortg., LLC*, No. 12-CV-3412, 2013 WL 5437648, at *2 (S.D.N.Y. Sept. 30, 2013) (internal quotation marks omitted); *see also Jiaxing Hongyu Knitting Co. v. Allison Morgan LLC*, No. 11-CV-9342, 2013 WL 81320, at *6 (S.D.N.Y. Jan. 8, 2013) (same); *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (same). Upon request, Plaintiff provided the Court with a copy of the Resolution Agreement, which was also attached as an exhibit to an affirmation that Plaintiff submitted in opposition to Defendants' first Motion To Dismiss. (*See* Aff. of Michael K. Lambert, Esq. in Opp'n to Defs.' Mot. to Dismiss, Ex. I (Dkt. No. 12).)

8

determination made by [OCR] regarding the . . . complaint filed against [Plaintiff]" in a Letter of

Findings, which stated the following:

> In its investigation, OCR reviewed documentation the complainant and [Plaintiff] provided. OCR also interviewed the complainant, the [complainant's son], staff from Pearl River, coaching staff from Ardsley School District (Ardsley), and other witnesses to the alleged incident. In addition, OCR reviewed a video recording of the basketball game, held on February 18, 2011.
> . . . .
>
> . . . OCR determined that there was sufficient evidence to conclude that the incident occurred as alleged. OCR further determined that [Plaintiff] had actual notice of the incident and promptly investigated the incident; however, OCR determined that [Plaintiff's] investigation was incomplete and insufficient. Specifically, [Plaintiff] did not attempt to interview more than three students to determine the source of the slur, even though [Plaintiff] was advised that the slur originated from the section of the bleachers where [Plaintiff's] students were seated. Further, [Plaintiff] did not interview the complainant, the [complainant's son], or any of the witnesses who advised [Plaintiff] that they heard the racial slur, and could have provided more information to assist [Plaintiff] in identifying the source of the slur.
>
> [Plaintiff] executed the . . . Resolution Agreement to resolve this complaint. OCR will monitor [Plaintiff's] implementation of the Resolution Agreement. Please be advised that if [Plaintiff] fails to comply with its terms, OCR will resume its investigation of this complaint.
>
> This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.
> . . . .
>
> Under the Freedom of Information Act, 5 U.S.C. § 552, it may be necessary to release this letter and related correspondence and records upon request. In the event that OCR receives such a request, it will seek to protect to the extent provided by law, personally identifiable information that if released could constitute an unwarranted invasion of personal privacy.

(Decl. of Ellen Blain in Supp. of Mot. To Dismiss, Ex. A ("Letter of Findings"), at 1–4.)

9

Three days after OCR issued the Letter of Findings, Plaintiff "notified [OCR] of its demand that the Letter of Findings be 'recalled, rescinded and otherwise repudiated and that the matter be closed through the issuance of the Resolution Letter.'"  (Am. Compl. ¶ 36.)  Although OCR did not take this requested action, it "determined that [Plaintiff] complied with every requirement of the . . . Resolution Agreement, concluded its monitoring of the agreement, and closed the case against [Plaintiff]" by letter dated March 6, 2012.  (*Id.* ¶ 39.)

According to Plaintiff, to date, OCR has "refused to rescind its determination and finding in the Letter of Findings that there was sufficient evidence to conclude that the incident occurred on February 18, 2011 as alleged by the [c]omplainant and that [Plaintiff's] investigation of the [c]omplainant's allegations was incomplete and insufficient."  (*Id.* ¶ 40.)  Plaintiff alleges that "[t]he contents and substance of the Letter of Findings is defamatory and has caused [Plaintiff] profound embarrassment," and "has degraded [Plaintiff's] reputation for being efficient, fair-minded and race-neutral in the performance of its obligations as a school district with a substantially Caucasian student and staff population towards its minority students and their parents, including in its investigation of claims of racial harassment as against African-American students."  (*Id.* ¶ 43.)[3]  Plaintiff further alleges that the Letter of Findings "was provided to the [c]omplainant by [Defendants]," and that "the substance of the contents of the Letter of

---

[3] According to Plaintiff, "[t]he racial make-up of [its] student population . . . is approximately 90% Caucasian, with an African-American student population approximately less than 5% of the student body."  (Am. Compl. ¶ 41.)  Additionally, "[Plaintiff's] faculty and administrative staff are predominantly Caucasian."  (*Id.*)  Plaintiff "has engaged in efforts throughout the years to address and reduce actual and perceived racially-based discrimination and/or harassment of minority students," which efforts have included "the promulgation of Title VI complaint and reporting procedures and policies and the appointment of multiple Title VI compliance officers to accept, investigate and report on incidents of such discrimination or harassment."  (*Id.*)

Findings . . . were published in local newspapers and have consequently become a matter of public knowledge in the community served by [Plaintiff] as well as the public in general." (*Id.* ¶ 42.)

Based on the foregoing allegations, Plaintiff asserts two different grounds for relief. First, Plaintiff claims that the determinations in OCR's Letter of Findings were "arbitrary, capricious, an abuse of discretion, without the observance of the procedures required by law and otherwise not in accordance with law and should be set aside by this Court" under the APA. (*Id.* ¶ 49.)  Second, Plaintiff claims that such determinations "deprived [it] of both procedural and substantive due process in violation of the [Fifth] Amendment to the United States Constitution."  (*Id.* ¶ 51.)  Plaintiff asks that the Court "compel [OCR] to withdraw and rescind their determination that 'the incident occurred as alleged' and that [Plaintiff's] 'investigation was incomplete and insufficient,'" and that the Court "grant [Plaintiff] such other and further relief as the Court may deem just and proper, including an award of [Plaintiff's] reasonable attorney fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412."  (*Id.* ¶¶ 51(1)–(2).)

### B.  Procedural Background

Plaintiff filed its original Complaint on April 13, 2012.  (*See* Dkt. No. 1.)  On January 4, 2013, Defendants filed a Motion To Dismiss, in which they argued that, because the Letter of Findings was not "final agency action," the APA precluded its review.  (*See* Dkt. Nos. 9–11.) Plaintiff filed its Opposition to Defendants' Motion on January 23, 2013, (*see* Dkt. Nos. 12–13), to which Defendants replied on March 15, 2013, (*see* Dkt. No. 15).

However, before the Court decided Defendants' Motion, it issued an Order, in keeping with its "independent obligation to consider the presence or absence of subject matter jurisdiction sua sponte," directing the Parties to "file supplemental briefs with the Court

11

addressing the issue of Plaintiff's standing." (Order (Apr. 30, 2013) (Dkt. No. 16).)  Following

the Parties' submission of responsive memoranda, the Court issued a second Order:

> In its supplemental brief on standing, Plaintiff focused on establishing that the reputational injury [that it allegedly suffered] qualifies as an injury in fact for purposes of establishing [Plaintiff's] standing to challenge the Defendants' action through the instant case, and Plaintiff asserted no other basis for standing.  However, Plaintiff's Complaint does not include *any* allegations with respect to reputation.  A plaintiff may not rely on an unpled injury to establish standing.  Accordingly, because the Complaint includes no allegations of reputational injury, or any other injury in fact, the Court finds that Plaintiff has failed to meet its burden of establishing standing.
>
> However, the Court notes that in certain circumstances, reputational injury may be sufficient to establish standing.
>
> Therefore, the Complaint is dismissed without prejudice, and Plaintiff is granted leave to file an amended complaint alleging an injury . . . .   Because the Court has dismissed the Complaint on standing grounds, Defendants' motion to dismiss on the basis of APA finality is moot and denied without prejudice.

(Order (June 5, 2013) (alterations, citations, and internal quotation marks omitted) (Dkt. No.

19.).)  Pursuant to this Order, Plaintiff filed an Amended Complaint on June 20, 2013.  (*See* Dkt.

No. 20.)  Defendants filed a second Motion To Dismiss on September 23, 2013,  (*see* Dkt. Nos.

30–32), to which Plaintiff responded the following day, (*see* Dkt. No. 33).  Defendants then

replied on October 30, 2013, (*see* Dkt. No. 36), at which point Defendants' Motion was fully

submitted.  The Court held oral argument on August 7, 2014.

## II.  DISCUSSION

### A.  Standard of Review

Defendants move to dismiss Plaintiff's Amended Complaint on two separate grounds.

First, they argue that Plaintiff lacks standing.  (*See* Defs.' Mem. in Supp. of Mot. To Dismiss

("Defs.' Mem.") 12–17.)  Second, they make substantially the same argument that they made in

their Motion To Dismiss Plaintiff's original Complaint—that the APA precludes the Court's

review of the Letter of Findings, because the Letter of Findings did not constitute final agency

action.  (*See id.* at 17–25.)  Defendants ground this second argument in Section 704 of the APA,

which provides that "final agency action for which there is no other adequate remedy in a court

[is] subject to judicial review," but that "[a] preliminary, procedural, or intermediate agency

action or ruling" is subject to challenge only "on the review of the final agency action."  5 U.S.C.

§ 704; *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007)

("The federal courts ordinarily are empowered to review only an agency's *final* action . . . .");

*Shakhnes v. Berlin*, 689 F.3d 244, 260 (2d Cir. 2012) ("Under the Administrative Procedure Act,

courts may not review agency actions unless such actions are 'final.'" (citation omitted)).[4]

Defendants' argument that Plaintiff lacks standing is jurisdictional in nature, and is thus

properly brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See Amidax*

*Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) ("[T]o survive [the

defendants'] Rule 12(b)(1) motion to dismiss, [the plaintiff] must allege facts that affirmatively

and plausibly suggest that it has standing to sue.");  *Arroyo v. PHH Mortg. Corp.*, No. 13-CV-

2335, 2014 WL 2048384, at *4 (E.D.N.Y. May 19, 2014) ("Although [the defendant] does not

mention Rule 12(b)(1) specifically, [its] argument regarding standing raises a question of subject

matter jurisdiction.").  However, the proper procedural vehicle for moving to dismiss a

complaint on the basis of the APA's finality requirement is less clear.  Although the Second

Circuit has previously "suggested that [the APA's finality requirement] delimits the subject

matter jurisdiction of federal courts," it has more recently noted that "[i]t is uncertain in light of

---

[4] Section 704 of the APA also states that "[a]gency action made reviewable by statute . . .
[is] subject to judicial review," 5 U.S.C. § 704, but no Party here claims that any statute other
than the APA itself authorizes the Court's review of the Letter of Findings.

recent Supreme Court precedent whether [that requirement is] truly jurisdictional or [is] rather [an] essential element[] of [an] APA claim[] for relief." *Sharkey v. Quarantillo*, 541 F.3d 75, 87 & n.10 (2d Cir. 2008) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514–15 (2006)); *see also Cnty. of Westchester v. U.S. Dep't of Hous. & Urban Dev.*, No. 13-CV-2741, 2013 WL 4400843, at *3 n.7 (S.D.N.Y. Aug. 14, 2013) (same).

If the APA's finality requirement is in fact jurisdictional in nature, then Defendants' challenge on this ground is properly considered under the standard of review applicable to motions brought under Rule 12(b)(1), just like their argument that Plaintiff lacks standing. *See Amidax*, 671 F.3d at 145; *Arroyo*, 2014 WL 2048384, at *4. However, if the requirement is instead merely an essential element of an APA claim for relief, then Defendants' challenge is properly considered under the standard of review applicable to motions brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) (noting that "any . . . element of a cause of action . . . must be adequately alleged at the pleading stage in order for the case to proceed"); *In re Lululemon Sec. Litig.*, — F. Supp. 2d —, 2014 WL 1569500, at *1 (S.D.N.Y. Apr. 18, 2014) (granting a motion to dismiss under Rule 12(b)(6) where the defendant argued that the complaint "fail[ed] to adequately allege the key elements of a cause of action"); *Burgis v. Dep't of Sanitation City of New York*, No. 13-CV-1011, 2014 WL 1303447, at *3 (S.D.N.Y. Mar. 31, 2014) (granting a motion to dismiss where the defendants argued that the "plaintiffs [had] not pleaded the necessary elements of a *prima facie* case, as required by Fed. R. Civ. P. 12(b)(6)"); *Matana v. Merkin*, 989 F. Supp. 2d 313, 325 (S.D.N.Y. 2013) ("In Rule 12(b)(6) terms, the Amended Complaint fails to plausibly plead [certain] element[s] . . . ."). Although the Second Circuit has not yet definitively resolved this issue, the better view appears to be that the

14

requirement is not jurisdictional in nature, but is instead merely an essential element of an APA claim for relief. *See Sharkey*, 541 F.3d at 87 n.10 (collecting cases from the First, Fourth, Sixth, and D.C. Circuits holding or suggesting that the finality requirement is not jurisdictional).

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)); *see also Neroni v. Coccoma*, No. 13-CV-1340, 2014 WL 2532482, at *4 (N.D.N.Y. June 5, 2014) (same). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonzalez*, 2014 WL 2475893, at *2 (internal quotation marks omitted); *see also Seemann v. U.S. Postal Serv.*, No. 11-CV-206, 2012 WL 1999847, at *1 (D. Vt. June 4, 2012) (same). However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." *Gonzalez*, 2014 WL 2475893, at *2; *see also Sobel v. Prudenti*, — F. Supp. 2d —, 2014 WL 2750364, at *10 (E.D.N.Y. June 18, 2014) ("In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." (internal quotation marks omitted)). This difference as to the allocation of the burden of proof is "[t]he only substantive difference" between the standards of review under these two rules. *Smith v. St. Luke's Roosevelt Hosp.*, No. 08-CV-4710, 2009 WL 2447754, at *9 n.10 (S.D.N.Y. Aug. 11, 2009), *adopted by* 2009 WL

15

2878093 (S.D.N.Y. Sept. 2, 2009); *see also Fagan v. U.S. Dist. Court for S. Dist. of N.Y.*, 644 F.

Supp. 2d 441, 446 (S.D.N.Y. 2009) (same).

 The Court will therefore lay out the standards of review applicable to motions brought

under both rules, keeping in mind that Plaintiff bears the burden of establishing that it has

standing in the context of Defendants' first argument, but that Defendants likely bear the burden

of demonstrating that Plaintiff's APA claims should be dismissed in the context of their second

argument.

  1. Rule 12(b)(1)

 "A federal court has subject matter jurisdiction over a cause of action only when it has

authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, — F. Supp. 2d —,

2014 WL 2475608, at *5 (E.D.N.Y. June 3, 2014) (internal quotation marks omitted) (quoting

*Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008), *vacated and superseded on reh'g on other*

*grounds*, 585 F.3d 559 (2d Cir. 2009) (en banc)).  "Determining the existence of subject matter

jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter

jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional

power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)

(internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also N.Y. State Citizens'*

*Coal. for Children v. Carrion*, — F. Supp. 2d —, 2014 WL 3545295, at *3 (E.D.N.Y. July 17,

2014) (same).  While a district court resolving a motion to dismiss under Rule 12(b)(1) "must

take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in

favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the

court has the power and obligation to decide issues of fact by reference to evidence outside the

pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has

the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alterations and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, — F. Supp. 2d —, 2014 WL 3891356, at *5 (S.D.N.Y. Aug. 8, 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2.  Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, internal quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks and alterations omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial

17

experience and common sense.  But where the well-pleaded facts do not permit the court to infer

more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in

original) (quoting Fed.R.Civ.P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous

departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock

the doors of discovery for a plaintiff armed with nothing more than conclusions.").

     "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the

sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation

marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.,* 737 F.3d 166, 176 (2d Cir. 2013)

("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the

complaint as true . . . ." (internal quotation marks and alterations omitted)).  Further, "[f]or the

purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in

favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y.

2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n

ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument

attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by

reference," as well as "matters of which judicial notice may be taken, and documents either in

plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."

*Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n. 1 (2d

Cir. 2014) (citation, internal quotation marks, and some alterations omitted); *see also Leonard F.

v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6)

18

motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of New York*, No. 12–CV–5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

    B.  Analysis

       1.  Standing

    Defendants' first argument as to why Plaintiff's Amended Complaint should be dismissed is that Plaintiff lacks standing.  (*See* Defs.' Mem. 12–17.)  "Article III standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'"  *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 520 n.2 (2d Cir. 2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "Litigants have Article III standing if they 'have suffered an injury in fact' that is 'fairly . . . trace[able] to the challenged action' and 'likely . . . [to be] redressed by a favorable decision.'"  *United States v. Technodyne, LLC*, 753 F.3d 368, 380 (2d Cir. 2014) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

    As stated previously, Plaintiff alleges that OCR's issuance of the Letter of Findings "has caused [Plaintiff] profound embarrassment," and "has degraded its reputation for being efficient, fair-minded and race-neutral in the performance of its obligations as a school district with a substantially Caucasian student and staff population towards its minority students and their parents, including in its investigation of claims of racial harassment as against African-American students."  (Am. Compl. ¶ 43.)  Plaintiff further alleges that the Letter of Findings "was provided to the [c]omplainant by [Defendants]," and that "the substance of the content of the Letter of Findings . . . were published in local newspapers and have consequently become a matter of

public knowledge in the community served by [Plaintiff] as well as the public in general."
(*Id.* ¶ 42.)  In other words, Plaintiff alleges that OCR's issuance of the Letter of Findings caused
it to suffer a "reputational injury."  (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. To Dismiss ("Pl.'s
Mem.") 1 ("The Amended Complaint . . . specifically alleges reputational injury flowing directly
from the issuance of the Letter of Findings by [Defendants].");  *id.* at 10 ("[Plaintiff] asserts that
the post-Resolution Agreement issuance and publication of the Letter of Findings . . . caused
[Plaintiff] reputational injury. . . .").)

Defendants do not take issue with the principle that reputational injury can, in some
cases, "constitute a cognizable injury sufficient for Article III standing."  (Defs.' Mem. 13
(internal quotation marks omitted).)   Nor could they—as the Second Circuit has observed, "[t]he
Supreme Court has long recognized that an injury to reputation will satisfy the injury element of
standing."  *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 161 (2d Cir. 2003) (citing,
*inter alia*, *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139 (1951); *Meese v.
Keene*, 481 U.S. 465, 472–77 (1987)); *see also Fairfield Cnty. Med. Ass'n v. United Healthcare
of New England*, No. 13-CV-1621, 2013 WL 6334092, at *4 (D. Conn. Dec. 5, 2013)
(recognizing "potential harm to . . . reputation[]" as a basis for standing), *aff'd as modified sub
nom. Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng., Inc.*, 557 F. App'x 53, 2014
(2d Cir. 2014).

Instead, Defendants invoke the doctrine of mootness.  "While the standing doctrine
evaluates [the litigant's] personal stake as of the outset of the litigation, the mootness doctrine
ensures that the litigant's interest in the outcome continues to exist throughout the life of the
lawsuit . . . ."  *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993); *see also Camreta v.
Greene*, 131 S. Ct. 2020, 2028 (2011) ("To ensure a case remains fit for federal-court

adjudication, the parties must have the necessary [personal] stake not only at the outset of

litigation, but throughout its course.").  Specifically, Defendants argue that, "where reputational

injury is the lingering effect of an otherwise moot aspect of a lawsuit, no meaningful relief is

possible and the injury cannot satisfy the requirements of Article III."  (Defs.' Mem. 13 (internal

quotation marks omitted).)  "Thus, where harm to reputation arises as a byproduct of

government action, the reputational injury, without more, will not satisfy Article III standing

*when that government action itself no longer presents an ongoing controversy*."  (*Id.* (internal

quotation marks omitted).)

According to Defendants, "Plaintiff's voluntary entry into and complete compliance with

the [Resolution] Agreement renders moot any possible claim based on reputational harm."  (*Id.*

at 16.)  "Pursuant to the [Resolution] Agreement, . . . [Plaintiff] agreed to conduct an additional

investigation into the incident and to review its grievance procedures," "thus agree[ing] to

remedy the precise deficiencies identified in the [Letter of Findings]."  (*Id.*)  Therefore,

Defendants claim, because Plaintiff "voluntarily entered into an agreement that explicitly

acknowledged and resolved the same agency compliance concerns that Plaintiff now seeks to

challenge," "[t]his renders moot any controversy based on alleged reputational harm resulting

from the Findings Letter."  (*Id.*)  "[T]he agency action at issue here is no longer in effect," as

"Plaintiff is not currently subject to any consent decree provision or other obligation resulting

from the [Letter of Findings] or OCR's investigation."  (*Id.* at 16–17.)

Defendants principally cite three cases in support of their argument: *Aulenback, Inc. v.

FHWA*, 103 F.3d 156 (D.C. Cir. 1997); *McBryde v. Committee To Review Circuit Council

Conduct & Disability Orders of the Judicial Conference of the United States*, 264 F.3d 52 (D.C.

Cir. 2001); and *ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010).  However, none of these cases supports Defendants' position, and each is distinguishable on multiple bases.

In *Aulenback*, the Federal Highway Administration, acting under the authority of the Secretary of Transportation, issued "out-of-service orders" against two commercial-trucking companies, Aulenback, Inc. ("Aulenback"), and Justin Transportation Co., Inc. ("Justin"), requiring them to cease all interstate-motor-carrier activities.  *See id.* at 158.  The FHWA issued those orders pursuant to its statutory authority, which requires the Secretary to "'order a vehicle or employee operating such vehicle out of service, or order an employer to cease all or part of the employer's commercial motor vehicle operations,'" if the Secretary determines that a violation of certain statutory safety provisions and accompanying regulations "'poses an imminent hazard to safety.'"  *Id.* at 159 (quoting 49 U.S.C. § 521(b)(5)(A)).  The FHWA's issuance of the orders followed its citation of both companies for numerous violations of federal safety regulations.  *See id.* at 159–61.  In addition to the orders themselves, the FHWA also issued news releases describing them, which were picked up by local media.  *See id.* at 159 ("According to Aulenback, the FHWA . . . issued a news release describing its action. . . . [N]ewspapers in the State of Maine, where Aulenback is based, printed articles stating that the trucking company had been shut down."); *id.* at 160 ("In conjunction with the out-of-service order [issued against Justin], the FHWA issued a news release, stating that it had declared Justin's operations 'immediately hazardous' and 'unfit' for highway transportation.").

"Under pressure to get its trucks back on the road, Aulenback began negotiating with the FHWA for a rescission of the out-of-service order."  *Id.* at 159.  Eventually, "[t]he FHWA conditionally rescinded the order . . . , and entered into a consent agreement and order with Aulenback."  *Id.*  "Pursuant to that agreement and order, Aulenback agreed to comply

22

immediately with applicable federal safety regulations, and to institute specified policies to remedy the violations for which it had been cited," and further "agreed that violations of the consent order could result in the imposition of civil or criminal penalties authorized by [statute], fines . . . , or issuance of an out-of-service order to eliminate an imminent hazard." *Id.* "Aulenback [also] waived any right to seek judicial review or otherwise challenge the validity of the consent order." *Id.*

As for the out-of-service order issued against Justin, "the FHWA conditionally rescinded [it], premised on a written statement by Justin's Chief Operations Manager attesting that the company had eliminated the imminent hazards cited in the out-of-service order and based on Justin's pledge to comply with the terms of an appropriate consent order," which Justin and the FHWA later executed. *Id.* at 160. "Like the Aulenback consent order, the Justin consent order required the company to comply with federal safety regulations, and to institute policies to remedy the violations cited in the out-of-service order," and "provided that any future violation of federal safety regulations or of the terms of the consent order would result in reinstitution of the out-of-service order, and additional civil penalties." *Id.* at 160–61.  However, "[u]nlike the Aulenback consent order, the Justin order did not contain a provision stating that the company had waived its right to further review." *Id.* at 161.

Despite Aulenback's and Justin's entry into their respective consent agreements with the FWHA, both companies later challenged the agency's action.  Specifically, they "contend[ed] that the FHWA lacked authority to issue the out-of-service orders because they were not premised upon a finding of an imminent hazard to public safety[,] as required" by the applicable statute. *Id.* at 161.  They also "contend[ed] that the FHWA ha[d] established an illegal policy of issuing such orders on the basis of inadequate findings, relying on secret rules in an internal

manual that [was] not generally available to the public," which rules they maintained were "inconsistent with [a] statutory requirement," and "invalid because they were issued without notice and opportunity for comment as required by the APA." *Id.* They sought "a declaratory judgment that the orders were void from the time they were issued," and an order "enjoin[ing] [the FHWA] from issuing out of-service orders based on [the] procedures" they claimed were deficient. *Id.*

But the D.C. Circuit "conclude[d] that the [companies'] challenges to [the out-of-service] orders [were] moot," finding that "the consent agreements entered into by Aulenback and Justin with the FHWA effectively settle[d] the controversy relating to [their] issuance." *Id.* The court grounded its holding in "the general rule that settlement moots a controversy," but also considered "whether any exception to [that] general rule . . . applie[d]." *Id.* at 163. It was in this context that the court addressed the issue of reputational harm, in the section of the opinion most relevant to the instant Action:

> Although Aulenback and Justin maintain that they continue to suffer the effects of the out-of-service orders, Aulenback by losing customers and Justin by having to halt operations as a result of the increased cost of insurance, any continued injury to their reputations derives largely from the FHWA's charges of misconduct, which they have acknowledged by acceding to the consent agreements. The carriers offer no reason why, if the rescission of the out-of-service orders and the entry of consent agreements did not bring back their customers, a declaratory judgment would be likely to do so.

*Id.* at 163 (citation omitted).

There are undoubtedly superficial similarities between the facts of *Aulenback* and those of the case before the Court. Like Aulenback and Justin, Plaintiff was the subject of an agency investigation, which investigation resulted in the agency's determination that Plaintiff was not in compliance with federal law. And like Aulenback and Justin, Plaintiff entered into an agreement

with the agency, through which Plaintiff sought to address the agency's concerns.  But there are also two critical distinctions to be drawn, which render *Aulenback*'s holding inapplicable here.

First, in *Aulenback*, the court based its holding that the settlement had mooted any controversy, including any controversy caused by the reputational injury that Aulenback and Justin claimed to have suffered, in part on its finding that the companies had "acknowledged" "the FHWA's charges of misconduct" "by acceding to the consent agreements."  *Id.*  Because neither the court in its decision nor the parties in their briefs reproduced the text of those agreements, it is unclear exactly what the court meant by the use of the word "acknowledged." There may have been explicit admissions of wrongdoing contained in the consent agreements, in which case the court may have been suggesting that those admissions mooted any claims of reputational injury, the idea being that a party lacks standing to sue on the basis of alleged reputational injury when it has, in effect, admitted that the injury to its reputation was warranted. If the court's holding was based on such explicit admissions, the case before the Court is easily distinguishable.  No such explicit admission appears anywhere in the Resolution Agreement, nor do Defendants claim as much.

Of course, in *Aulenback*, the companies may not have made any *explicit* admissions of wrongdoing in the consent agreements, in which case the court may have been suggesting that their mere entry into those agreements constituted *implicit* admissions of wrongdoing, thereby mooting any claims of reputational injury.  In other words, the court may have been suggesting that the companies could not have continued to suffer reputational injury as a result of the FHWA's charges of misconduct, as they had effectively conceded the truth of those charges by agreeing to take action to remedy them.  But this scenario seems speculative.  As the Second Circuit has noted, it is a "fact that settlements are often reached for economic reasons and not

because of concessions on legal issues." *Sampson v. Radio Corp. of Am.*, 434 F.2d 315, 317 (2d

Cir. 1970); *cf. Denney v. Deutsche Bank AG*, 443 F.3d 253, 274 (2d Cir. 2006) ("appreciat[ing]

[the defendant's] argument that payments it may make in settlement do not necessarily signify

its concession of its liability," and noting that "such payments would foreseeably be made . . . on

account of liability or the risk thereof, including the reputational risk that is often at stake in . . .

litigation"). The notion that a party's settlement of a claim does not necessarily constitute an

explicit or implicit admission of liability is even built into the Federal Rules of Evidence, in the

form of Rule 408, which prohibits the admission of evidence of "furnishing, promising, or

offering . . . a valuable consideration in compromising or attempting to compromise [a] claim"

"to prove or disprove the validity or amount of [the] disputed claim." Fed. R. Evid. 408(a)(1).

Part of the rationale behind this rule is that such "evidence is irrelevant, since [an] offer [of

settlement] may be motivated by a desire for peace rather than from any concession of weakness

of position." Fed. R. Evid. 408 advisory committee's note.[5]

It may be that, even though the *Aulenback* court was not taking the position that entry

into a consent agreement constitutes an implicit admission of wrongdoing as a general matter,

the specific facts of that case suggested that the companies had implicitly admitted their

wrongdoing through their conduct. But if this was the basis for the court's holding, the facts of

the instant Action are once again distinguishable. Based on Plaintiff's Amended Complaint,

nothing that Plaintiff did could be construed as any kind of implicit admission. Quite to the

contrary, as noted above, Plaintiff took pains to ensure that the following statement was

---

[5] In fact, in *Aulenback*, the court suggested that Aulenback "began negotiating with the
FHWA for a rescission of the out-of-service order" not because it had reached the conclusion
that the charges contained in the FHWA's out-of-service order were true, but because it was
"[u]nder pressure to get its trucks back on the road." 103 F.3d at 159.

contained in the Resolution Agreement: "The execution of this Resolution Agreement does not constitute an admission that [Plaintiff] has committed any violation of Title VI or its implementing regulations.  Nor does execution of this Resolution Agreement constitute any admission of other wrongdoing by [Plaintiff]."  (Resolution Agreement 3.)  There is no indication in *Aulenback* that the consent agreements described therein contained a similar clause.  Thus, regardless of which facts led the court in *Aulenback* to emphasize that the companies had "acknowledged" "the FHWA's charges of misconduct" "by acceding to the consent agreements" in holding that the companies' claims of reputational injury had been mooted, *Aulenback*, 103 F.3d at 163, no comparable facts have been presented here.

Therefore, the mere fact that, by entering into the Resolution Agreement, Plaintiff "agreed to conduct an additional investigation into the incident and to review its grievance procedures," "thus agree[ing] to remedy the precise deficiencies identified in the [Letter of Findings]," (Defs.' Mem. 16), is not dispositive as to Plaintiff's standing, as it may have been in *Aulenback*.  Like many other parties entering into settlement agreements, Plaintiff claims to have done so for reasons unrelated to any desire to concede the illegality of its actions.  Indeed, in this case, Plaintiff claims to have done so for the exact opposite reason.  According to Plaintiff, it "entered into the . . . Resolution Agreement to avoid the issuance of a Letter of Finding [sic] . . . which might suggest that there was any merit to the [c]omplainant's allegations . . . or that [Plaintiff] had not taken appropriate action to address the allegations."  (Am. Compl. ¶ 23; *see also id.* ¶ 15 (alleging that Plaintiff communicated to Defendants that it "was prepared to enter into a resolution agreement in order to resolve the complaint" "notwithstanding its strong belief that its comprehensive investigation yielded no credible evidence suggesting that the alleged

incident occurred").)  Plaintiff does not allege that it entered into the Resolution Agreement to admit that it had broken the law; it alleges that it did so to avoid the appearance that it had.

What is more, *Aulenback* is also distinguishable for a second and equally important reason.  The *Aulenback* court appears to have understood the companies to be alleging that the reputational injury that they had suffered stemmed from the FHWA's issuance of the out-of-service orders.  *See Aulenback*, 103 F.3d at 163 (noting that the companies "maintain[ed] that they continue[d] to suffer the effects of the out-of-service orders," including "continued injury to their reputations").  But by the time the companies had filed their action, those orders had been rescinded, pursuant to the consent agreements described above.  *See id.* at 159–61.  Thus, the agency action that was supposedly causing the companies their alleged reputational injury was no longer in effect.  This fact seems to have been a driving force behind the court's decision, and explains its observation that the companies "offer[ed] no reason why, if the rescission of the out-of-service orders and the entry of consent agreements did not bring back their customers, a declaratory judgment would be likely to do so."  *Id.* at 163.

By contrast, in the instant Action, Plaintiff does not allege that it continues to suffer reputational injury as the result of agency action that is no longer in effect.  Although in attempting to analogize this case to *Aulenback*, Defendants claim that "the agency action at issue here is no longer in effect" because "Plaintiff is not currently subject to any consent decree provision or other obligation resulting from the [Letter of Findings] or OCR's investigation," (Defs.' Mem. 16–17), this characterization of Plaintiff's Amended Complaint misses the mark. The agency action that Plaintiff alleges is the source of its reputational injury is not a consent decree provision or other obligation *resulting* from the Letter of Findings or OCR's investigation—it is the issuance of the Letter of Findings *itself*.  (*See* Am. Compl. ¶ 43 ("The

28

contents and substance of the Letter of Findings is defamatory and has caused [Plaintiff] profound embarrassment, [and] has degraded its reputation for being efficient, fair-minded and race-neutral in the performance of its obligations as a school district with a substantially Caucasian student and staff population toward its minority students and their parents . . . ."); Pl.'s Mem. 10 ("[Plaintiff] asserts that the post-Resolution Agreement issuance and publication of the Letter of Findings . . . caused [Plaintiff] reputational injury . . . .").)  According to Plaintiff, OCR has not rescinded the Letter of Findings to date, (*see* Am. Compl. ¶ 40), and rescission of the Letter of Findings is the chief form of relief that Plaintiff is currently seeking, (*see id.* ¶ 50(1)).  Thus, for both of these reasons, *Aulenback* is inapposite, and provides no support for Defendants' position.[6]

        The next case that Defendants cite in arguing that Plaintiff's claim of reputational injury is moot is *McBryde v. Committee To Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the United States*, 264 F.3d 52 (D.C. Cir. 2001).  There, the Judicial Council of the Fifth Circuit ("the Judicial Council"), acting under the Judicial Conduct and Disability Act of 1980 ("the JCDA"), 28 U.S.C. §§ 351–64, imposed sanctions on the Honorable John H. McBryde, United States District Judge for the Northern District of Texas ("Judge McBryde"), following a two-year investigation by a Special Committee of the Judicial Council ("the Special Committee") into "incidents spanning the entirety of Judge McBryde's judicial career and involving encounters with judges and lawyers both inside and outside his courtroom."

---

        [6] The Court of course notes that, because *Aulenback* was decided by the United States Court of Appeals for the District of Columbia Circuit, the Court is not bound to follow its holding.  *See Blair v. Deboo*, No. 04-CV-1357, 2004 WL 3052022, at *2 (D. Conn. Dec. 30, 2004) ("[T]he Court is not bound by the decisions of any courts other than the Second Circuit Court of Appeals and the United States Supreme Court.").  Additionally, it appears as though no court within the Second Circuit has ever cited to *Aulenback* for any reason.

*Id.* at 54.  The investigation included nine days of hearings, and "culminated in a 159-page report in which the Special Committee concluded that Judge McBryde had engaged for a number of years in a pattern of abusive behavior that was prejudicial to the effective and expeditious administration of the business of the courts."  *Id.* (alterations and internal quotation marks omitted).

The Special Committee recommended (1) that Judge McBryde "receive a public reprimand"; (2) "that no new cases be assigned to him for a year"; and (3) "that he not be allowed for three years to preside over cases involving any of 23 lawyers who had participated in the investigation."  *Id.*  The Judicial Council subsequently endorsed the Special Committee's recommendations, issuing an order imposing all of the recommended sanctions.  *Id.*  The Committee To Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States ("the Review Committee") substantially affirmed the Judicial Council's actions.  *Id.* at 55.

Following this affirmance, Judge McBryde brought suit in district court, claiming that the JCDA "violated the due process clause and the Constitution's separation of powers doctrine," "that the initiation and conduct of the investigation against him exceeded the authority granted by the [JCDA]," and that the JCDA's "restrictions on disclosing the record of the proceedings" violated the First Amendment.  *Id.*  "[T]he district court agreed with Judge McBryde's First Amendment argument, but rejected the rest."  *Id.* (citation omitted).  Judge McBryde thereafter appealed, "repeat[ing] the essence of his remaining arguments."  *Id.*

On appeal, the D.C. Circuit first considered whether Judge McBryde's claims were moot. *Id.*  It found that they were, but only "insofar as they distinctively relate[d] to the one-year suspension . . . and the three-year disqualification," the second and third sanctions that the

30

Review Committee affirmed, both of which "bans [had] expired" by the time the court heard his

case.  *Id.*  As the court stated, "[n]o relief sought . . . would return to Judge McBryde the cases

he was not assigned or otherwise improve his current situation. . . .  [T]he two restrictions on

Judge McBryde's docket [had] become moot."  *Id.* at 55–56.  But the court also held that "[t]he

dispute over the public reprimand," the first sanction imposed against Judge McBryde,

"remain[ed] alive":

> Any thought that the reprimand is a past and irreversible harm is belied by the fact
> that it continues to be posted on the web site of the Fifth Circuit Court of Appeals,
> with a link on the home page alongside items for current use such as the court's
> calendar and opinions.  Even absent that use of modern technology it would be part
> of the historical record.  Were Judge McBryde to prevail on the merits it would be
> within our power to declare unlawful the defendants' issuance of stigmatizing reports
> and thereby to relieve Judge McBryde of much of the resulting injury.
>
> No one has suggested that this injury to reputation is not enough to afford Judge
> McBryde standing . . . .  But we have a duty to be sure of our own jurisdiction, so we
> consider the question.  The Court has, of course, ruled that mere injury to reputation
> is not enough of an impingement on a person's liberty or property interest to trigger
> a requirement of due process.  But injury to reputation can nonetheless suffice for
> purposes of constitutional standing. . . .  Here, the official characterization of an
> apparently upstanding federal judge as having engaged for a number of years in a
> pattern of abusive behavior that was prejudicial to the effective and expeditious
> administration of the business of the courts inflicts, we think, enough injury.

*Id.* at 56–57 (citations, footnotes, and internal quotation marks omitted).

Defendants invoke *McBryde* as an example of a case the facts of which supposedly

contrast with those before the Court.  (*See* Defs.' Mem. 14 ("By contrast [to *Aulenback*], where

the government action at issue is still in effect or has not been otherwise resolved by the parties,

courts . . . have held that a plaintiff may have standing based on alleged reputational harm."

(citing, *inter alia*, *McBryde*)); *id.* at 16 ("[U]nlike the actions at issue in . . . *McBryde* . . . , the

agency action at issue here is no longer in effect.").)  But *McBryde* is directly on point, and it

supports Plaintiff's position here.  Plaintiff does not challenge Defendants' representation that,

just like the one-year suspension and three-year disqualification in *McBryde*, the provisions of the Resolution Agreement are no longer in effect.  (*See* Defs.' Mem. 17 ("Plaintiff is not currently subject to any consent decree provision or other obligation resulting from the [Letter of Findings] or OCR's investigation.").)  However, just like the public reprimand in *McBryde*, the Letter of Findings has not been rescinded, and is still "part of the historical record."  *McBryde*, 264 F.3d at 57.  Furthermore, while there is no indication that the Letter of Findings was posted on OCR's website, OCR appears to be of the opinion that it may be publicly accessible.  (*See* Letter of Findings 4 ("Under the Freedom of Information Act, 5 U.S.C. § 552, it may be necessary to release this letter and related correspondence and records upon request.").)  In any event, Plaintiff alleges that the Letter of Findings "was provided to the [c]omplainant by [Defendants]," and that "the substance of the content of the Letter of Findings . . . were published in local newspapers and have consequently become a matter of public knowledge in the community served by [Plaintiff] as well as the public in general."  (Am. Compl. ¶ 42.)

Like Defendants' invocation of *Aulenback*, their invocation of *McBryde* appears to be based on their misconception as to what agency action Plaintiff is challenging, which is OCR's issuance of the Letter of Findings, not the Parties' entry into the Resolution Agreement.  The agency action that Plaintiff challenges here is much more like the public reprimand than the suspension or disqualification in *McBryde*, and as such, *McBryde* does not strengthen Defendants' position.

The third case that Defendants cite is the only such case from within the Second Circuit. *ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010), has a complicated factual background, only the pertinent aspects of which the Court will describe here.  At some point before the litigation began, the Association of Community Organizations for Reform Now ("ACORN"), "a

non-profit Arkansas corporation that organizes low- and moderate-income persons 'to achieve

social and economic justice,'" "came under serious public scrutiny" following allegations that its

employees had engaged in embezzlement, voter-registration fraud, and other wrongful conduct.

*Id.* at 129–31.  In the wake of these allegations, "[o]n October 1, 2009, Congress passed a 'stop-

gap' appropriations law to fund federal agencies prior to the enactment of the 2010 Fiscal Year

appropriations," Section 163 of which "singled out ACORN" by stating that "[n]one of the funds

made available by [the] joint resolution or any prior Act [could] be provided to [ACORN], or

any of its affiliates, subsidiaries, or allied organizations."  *Id.* at 131 (internal quotation marks

omitted).  "Section 163 . . . [was] set to expire on December 18, 2009."  *Id.*

Following the passage of Section 163, in a memorandum dated October 7, 2009, the

Director of the Office of Management and Budget ("the OMB") "advised the heads of all

executive agencies" of the following:

> (1) that Section 163 prohibited them from providing any federal funds to ACORN
> and its affiliates, subsidiaries, and allied organizations during the period of the
> Continuing Resolution;
>
> (2) to suspend any existing contracts with ACORN and its affiliates where
> permissible; and
>
> (3) to take steps so that no Federal funds [were] awarded or obligated by [the
> agencies'] grantees or contractors to ACORN or its affiliates as subcontractors, or
> other subrecipients.

*Id.* (internal quotation marks omitted).

Just over one month later, on November 12, 2009, ACORN commenced a district-court

action to enjoin the United States, the Secretary of the Treasury, the Secretary of the Department

of Housing and Urban Development ("HUD"), and the Director of OMB from enforcing Section

163, eventually moving for a preliminary injunction seeking the same relief, which injunction

33

the district court granted on December 11, 2009. *Id.* at 131–32.[7]  "In response to the District Court's ruling, the OMB rescinded its memorandum addressing the heads of all executive agencies on Section 163." *Id.* at 132.  In the meantime, "Congress passed appropriations laws for fiscal year 2010, which President Obama signed into law," "[o]ne section of [which] used identical language to that of Section 163 and specifically excluded ACORN and its affiliates, subsidiaries, and allies from federal funding." *Id.* (alterations and internal quotation marks omitted).  Four other sections of the appropriations laws "similarly excluded ACORN and its subsidiaries from federal funding." *Id.* (internal quotation marks omitted).  Further, "the appropriations laws [also] included Section 535, which directed the [Government Accountability Office ("GAO")] to conduct a review and audit of the Federal funds received by ACORN or any subsidiary or affiliate of ACORN," in order to determine the following:

> (1) whether any Federal funds were misused and, if so, the total amount of Federal funds involved and how such funds were misused;
>
> (2) what steps, if any, [had] been taken to recover any Federal funds that were misused;
>
> (3) what steps should be taken to prevent the misuse of any Federal funds; and
>
> (4) whether all necessary steps [had] been taken to prevent the misuse of any Federal funds.

*Id.* (alterations omitted).

---

[7] ACORN was not alone in filing the initial district-court action, subsequent requests for relief at the district court, or its eventual appeal at the Second Circuit.  Rather, it was joined by Acorn Institute, Inc., and Mhany Management, Inc., f/k/a/ New York Acorn Housing Company, Inc., both of which were affiliated entities.  *See id.* at 129 & n.1.  "The legal and governance structure of ACORN and its separate but interrelated components, such as Acorn Institute and New York Acorn, is incredibly complex . . . ."  *Id.* at 130.  For the sake of simplicity, the Court will refer to the plaintiffs in the district-court action, which became the plaintiffs–appellees in the Second Circuit action, collectively as "ACORN."

In light of this new legislation, ACORN "filed an amended complaint challenging [those] sections of the latest appropriations laws" that targeted ACORN, as well as "the by-then-expired Section 163." *Id.* In addition to the defendants named in the original complaint, the amended complaint named the Administrator of the Environmental Protection Agency, the Secretary of Commerce, and the Secretary of Defense. *Id.* On March 10, 2010, the district court "granted [ACORN's] request for declaratory relief and a permanent injunction," holding "that the appropriations laws constituted unconstitutional bills of attainder; that [ACORN] possessed standing to bring [its] claims against the named defendants; and that a permanent injunction was warranted in light of the . . . irreparable injuries suffered by [ACORN]." *Id.* at 132–33. The defendants appealed the district court's decision on a number of grounds, including "that [ACORN] lack[ed] standing against . . . the Director of OMB, because [it could not] show an actual injury that [was] fairly traceable to any current or anticipated actions by [that] . . . defendant[]." *Id.* at 133. The defendants argued that ACORN "[had] not suffered any injury caused by OMB because Section 163 [was] no longer effective; OMB rescinded its memorandum advising the heads of all the executive agencies; and, in any event, OMB [had] no authority to enforce federal statutes." *Id.* at 133–34.

On appeal, the Second Circuit rejected the defendants' arguments, finding that ACORN had standing to sue the Director of OMB on the basis of injuries to ACORN's reputation:

> The government's argument that [ACORN] lack[s] standing to sue the Director of OMB is . . . misplaced. Although the government asserts that OMB has no authority to enforce federal statutes, OMB oversees the execution of the federal budget and has a continuing responsibility to explain appropriations provisions to agencies. To that end, OMB's now-rescinded memorandum—which is the basis for the plaintiffs' claim of reputational injury with respect to Section 163—was issued. As explained by the District Court, notwithstanding the rescission of the OMB memorandum and expiration of Section 163, the OMB memorandum continues to exert influence over [ACORN's] reputation:

35

> Following the District Court's entry of a preliminary injunction, OMB did send an email to all federal agencies' general counsels informing them of the injunction entered and that the government was considering appeal, but OMB did not direct them to inform their agencies, grantees, and grantees' subcontractors of [the district court's] ruling.   The reputational harm, therefore, continues, as the original advice from OMB to the hundreds, if not thousands, of recipients of that advice has never been rescinded.

> Indeed, the OMB memorandum providing guidance for application of Section 163 is still available on OMB's website.   Although the website states that the memorandum has been rescinded, there is also a notation that "the enacted restrictions on funding ACORN and affiliates remain in force" in light of [the Second Circuit's] granting the government's motion for a stay pending appeal.  Thus, what is called a rescission in fact functioned in no such way.   In light of OMB's actual and continuing responsibility to oversee the management of the budgets of Executive Branch agencies, and its consequent impact on [ACORN's] reputation, [ACORN has] shown sufficient injury to bring suit against the Director of the OMB.

*Id.* at 134–35 (alterations and citations omitted).

This passage significantly undermines Defendants' argument that Plaintiff lacks standing here.  At the time of the appeal, the Second Circuit held that ACORN had standing to challenge a law that was no longer in effect, on the basis of a memorandum that had been rescinded, because the agency that rescinded the memorandum had not taken sufficient steps to ensure that the parties who had initially received it were aware that it had been rescinded.  To adopt Defendants' characterization of the court's holding, "the rescission was incomplete."  (Defs.' Mem. 15.)  But here, Plaintiff is not challenging a law that is no longer in effect, on the basis of a memorandum that has been rescinded.  Instead, Plaintiff is challenging only the Letter of Findings.  The rescission of the Letter of Findings is not incomplete—it never began in the first place.

A fourth case that Defendants cite, but do not discuss in as substantial detail as the foregoing three, also bears mentioning.  In *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003), Dr. Eric A. Foretich ("Dr. Foretich") and his former wife, Dr. Jean Elizabeth Morgan ("Dr. Morgan"), had "contested visitation and custody rights with respect to their daughter,

Hilary, since Hilary's birth in 1982." *Id.* at 1203.  After the D.C. Superior Court awarded custody of Hilary to Dr. Morgan but broad visitation rights to Dr. Foretich, "Dr. Morgan continually objected to and obstructed Dr. Foretich's rights, claiming that Dr. Foretich and his parents had sexually abused Hilary," which claims Dr. Morgan raised in D.C. Superior Court, but which claims "were never credited." *Id.*  "In her final act of defiance, Dr. Morgan hid Hilary from the court and from the child's guardian *ad litem* and refused to reveal her whereabouts," "consequently serv[ing] over two years in jail on civil contempt charges." *Id.*  Dr. Morgan "ultimately fled the country to go into hiding with her daughter." *Id.*

After this "custody dispute gained extraordinary notoriety in the media," "Congress intervened and passed the Elizabeth Morgan Act," which act "achieved two principal aims":

> First, Dr. Morgan and her daughter were able to return to the United States without being subject to the outstanding orders of the D.C. Superior Court.  Second, even though the Superior Court had never credited Dr. Morgan's allegations of sexual abuse and had deemed Hilary's visitation with her father to be in the child's best interests, the Act made it clear that Dr. Foretich could no longer secure visitation with his daughter without first obtaining Hilary's consent.

*Id.* at 1203–04.

"[W]hile Hilary was still a minor, Dr. Foretich and his parents filed [a] lawsuit against the United States challenging the Act as an unconstitutional bill of attainder and a violation of due process, separation of powers, and principles of D.C. home rule." *Id.* at 1204.  The district court subsequently rejected those claims, granting summary judgment in favor of the United States and Dr. Morgan, who had intervened as a defendant. *Id.*  The D.C. Circuit reversed, finding that the act was in fact an unconstitutional bill of attainder. *Id.*  But before it reached that conclusion, the court first considered the issue of standing, as "Dr. Morgan [had] moved to dismiss the Foretichs' appeal as moot on the grounds that Hilary turned 18 [before the appeal

was heard] and that the Superior Court therefore no longer [had] child custody jurisdiction over her." *Id.* at 1209.

The court agreed that, because Hilary had turned 18 before the appeal, "and because the child custody jurisdiction of the D.C. Superior Court extends only to minor children," "Dr. Foretich's claim [was] moot," but only "insofar as it challenge[d] the Act's negation of his visitation rights." *Id.* The court rejected the argument that "the Foretichs cannot maintain Article III standing with respect to any of their other alleged injuries, including harm to Dr. Foretich's personal and professional reputation." *Id.* at 1210. Dr. Foretich had alleged in the district-court action "extraordinary injuries to his reputation resulting from the passage of the Act," including his "continual[] harass[ment] by the media"; strangers "remind[ing] [him] . . . that Congress considered him a danger to his daughter"; "a 30% decline [in his oral-surgeon business] following adoption of the Act"; a university's denial of his application for a position "in part because of the Act"; and his requested resignation of his position as Regent of the American College of Oral and Maxillofacial Surgeons "on the grounds that it would not be appropriate for an officer to serve after Congress had taken action finding that [he] had abused [his] daughter." *Id.* at 1209 (internal quotation marks omitted). According to the D.C. Circuit, "[t]his claim clearly [gave] Dr. Foretich standing in [the] case," as "Congress's act of judging [him] and legislating against him on the basis of that judgment . . . directly [gave] rise to a cognizable injury to his reputation that [could] be redressed by a declaratory judgment in [his] favor." *Id.* at 1213.

Applying this holding here yields the conclusion that Plaintiff has standing to assert its claims. Plaintiff is not alleging that it has standing on the basis of reputational harm suffered as the result of OCR's entry into the Resolution Agreement. If it was, then *Foretich* might suggest

that the Court should dismiss this Action.  To paraphrase *Foretich*, "when a government entity enters into an agreement with a school district pursuant to which the school district is required to conduct further investigation into an alleged incident of racial harassment, review and revise its harassment policy and related grievance procedures, and utilize its on-going training programs that raise awareness of the issue of harassment for staff and students, the government entity's action arguably damages that school district's reputation and standing in the community, particularly among its minority students and their families."  But although OCR's entry into the Resolution Agreement conceivably could have caused Plaintiff reputational harm, such harm would be "merely the secondary effect of an injury that is otherwise moot."  Like the vitiation of Dr. Foretich's custodial rights, the terms of the Resolution Agreement no longer have any legal effect.

But to reiterate, that is not Plaintiff's theory.  Instead, Plaintiff argues that its reputational harm derives from OCR's issuance of the Letter of Findings.  To paraphrase *Foretich* once more, Plaintiff's "principal complaint is that the Letter of Findings harmed its reputation by embodying OCR's determination that the alleged incident of racial harassment occurred as alleged and that Plaintiff's investigation was incomplete and insufficient."  Like the congressional determination that Dr. Foretich was "a child abuser and a danger to his own daughter," Defendants' determination that the incident occurred and that Plaintiff's investigation was deficient "clearly gives Plaintiff standing in this case."

As described in relation to the other cases discussed above, Defendants' position that Plaintiff lacks standing rests on their misconception that the government action that Plaintiff is challenging is OCR's entry into the Resolution Agreement, instead of its issuance of the Letter of Findings.  To the extent that this apparent misconception is actually premised on the more

subtle argument that the legal requirements imposed by the Resolution Agreement and the factual determinations embodied in the Letter of Findings on which those legal requirements are based are a single, indivisible government action, and that the mootness of any reputational injury caused by the Resolution Agreement should thereby moot any reputational injury caused by the Letter of Findings as well, *Foretich* demonstrates that courts in fact distinguish between these two possible sources when assessing whether a controversy over reputational harm remains live.  Even though "Plaintiff [may no longer be] subject to any consent decree provision or other obligation resulting from the [Letter of Findings] or OCR's investigation," (Defs.' Mem. 17), and even though the secondary effect to Plaintiff's reputation that it may continue to suffer as the result thereof may be moot, that does not mean that Plaintiff necessarily lacks standing on the basis of the harm to its reputation caused by the Letter of Findings' factual determinations.

In short, the case before the Court is less like *Aulenback*, and more like *McBryde*, *ACORN*, and *Foretich*.  The Court is unaware of, and Defendants have not provided, any case from within the Second Circuit or elsewhere that would suggest that Plaintiff lacks standing on the basis of the reputational harm it has allegedly suffered stemming from OCR's issuance of the Letter of Findings, as distinct from OCR's entry into the Resolution Agreement.  Based on Plaintiff's Amended Complaint, it has never explicitly or implicitly admitted the truth of the Letter of Findings' factual determinations, which remain "unexpired and unretracted," *Foretich*, 351 F.3d at 1213, and which thereby confer standing on Plaintiff to pursue the instant Action.

### 2.  Final Agency Action

Defendants also move to dismiss Plaintiff's APA claims on the ground that the APA bars their review by this Court, as OCR's issuance of the Letter of Findings did not constitute final agency action.  (*See* Defs.' Mem. 17–25.)  Section 704 of the APA states in pertinent part that

"final agency action for which there is no other adequate remedy in a court [is] subject to judicial review," but that "[a] preliminary, procedural, or intermediate agency action or ruling" is subject to review only "on the review of the final agency action."  5 U.S.C. § 704; *see also Nat'l Ass'n of Home Builders*, 551 U.S. at 659 ("The federal courts ordinarily are empowered to review only an agency's *final* action . . . ."); *Shakhnes*, 689 F.3d at 260 ("Under the Administrative Procedure Act, courts may not review agency actions unless such actions are 'final.'" (citation omitted)).

According to the Second Circuit, "[a]n agency action is final if two conditions are met: (1) the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature, and (2) the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Shakhnes*, 689 F.3d at 260 (internal quotation marks omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)); *see also Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 96 (2d Cir. 2013) (same).  The Parties agree that this standard governs whether the Court is empowered to review OCR's issuance of the Letter of Findings under the APA.  (*See* Pl.'s Mem. 21–23; Defs.' Mem. 18–19.)

For reasons that will become clear throughout the course of this Opinion, the Court's analysis begins and ends with the second prong of the finality test.  Because the Court concludes that Plaintiff has not demonstrated that OCR's issuance of the Letter of Findings determined any rights or obligations or that any legal consequences flowed therefrom under the second prong, the Court does not reach the question of whether it marked the consummation of the agency's decisionmaking process under the first.  *Cf. Paskar*, 714 F.3d at 99 (finding that agency action was not final because it failed to satisfy the finality test's second prong, without considering whether it satisfied the first); *Barry v. U.S. S.E.C.*, No. 10-CV-4071, 2012 WL 760456, at *6 (E.D.N.Y. Mar. 7, 2012) (same); *Serotte, Reich & Wilson, LLP v. Montante*, No. 05-CV-284,

41

2009 WL 3055294, at *6 (W.D.N.Y. Sept. 21, 2009) (finding that agency action was not final

because it failed to satisfy the finality test's first prong, without considering whether it satisfied

the second); *Runaway Dev. Grp. v. Pentegen Techs. Int'l Ltd.*, 396 F. Supp. 2d 471, 474

(S.D.N.Y. 2005) (same).[8]

---

[8] Although the Court does not reach the question of whether OCR's issuance of the Letter of Findings marked the consummation of the agency's decisionmaking process under the first prong of the finality test, the Court seriously doubts that it did. The only case that the Court was able to locate in which a court considered whether the Department of Education's issuance of a letter of findings constitutes final agency action explains the basis for the Court's doubt.

In *Doe v. New York University*, 511 F. Supp. 606 (S.D.N.Y. 1981), the plaintiff secured a leave of absence from New York University ("NYU") because of various psychological problems she had been having, but was then refused readmission the following year. *Id.* at 607. She subsequently filed an action against NYU, alleging that its refusal to readmit her violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. *Id.* She also pursued her administrative remedies with the Department of Health, Education and Welfare ("HEW"), "predecessor to the current Department of Education," *Ceaser v. Pataki*, 98-CV-8532, 2000 WL 1154318, at *3 (S.D.N.Y. Aug. 14, 2000), as well as with the Department of Education itself, after its creation in 1980, *see N.Y. Univ.*, 511 F. Supp. at 608 & n.3. Following the completion of discovery, "HEW issued a Letter of Findings, ruling that N.Y.U. had violated the Rehabilitation Act," after which the court placed the plaintiff's case "on suspense to allow HEW an opportunity to resolve the matter." *N.Y. Univ.*, 511 F. Supp. at 608. The plaintiff later "brought [a] motion to restore the case to the active calendar," and "also moved to shift the burden of proof from her to [NYU]." *Id.*

In regard to the plaintiff's attempt to shift the burden of proof, the court stated that the plaintiff "move[d], in effect, to have [the] [c]ourt serve only as a 'reviewing court' of an agency action," but then noted that "the provisions for judicial review under the [APA] [did] not literally apply to the case at bar":

> [O]nly final agency action is reviewable. 5 U.S.C. § 704. . . .  [T]he regulations indicate that [the Department of] Education still has the option of initiating further proceedings either to terminate [NYU's] federal financial assistance or to achieve compliance by "other means authorized by law." 34 C.F.R. § 100.8 (1980). The Litigation Report of the Chief Regional Civil Rights Attorney . . . recommends enforcement in this case and referral to the Department of Justice. Thus, the case may very well still be alive . . . .

*Id.* at 608–09 & n.5.

Thus, in what appears to be the only case in which a court has considered whether the Department of Education's issuance of a letter of findings was final agency action, the court determined that it was not, basing its reasoning exclusively on the ground that such issuance

a.  "By Which Rights or Obligations Have Been Determined"

Plaintiff argues that "OCR's decision to issue the adverse Letter of Findings to [Plaintiff]" satisfies the second prong because it "determined the rights or obligations of OCR to do so in those circumstances, as well as that of [Plaintiff] (to not suffer an adverse Letter of Findings where it has already entered into a resolution agreement)."  (Pl.'s Mem. 25–26.) Although Plaintiff's wording is confusing, it appears to be arguing that, by issuing the Letter of Findings, OCR "determined" that it had the "right" or "obligation" to issue the Letter of Findings, and also "determined" that Plaintiff did not have the "right" to have OCR not issue the Letter of Findings.

This argument collapses under the weight of its own circularity.  If the Court were to accept the reasoning embedded therein, the second prong would be completely eviscerated. Application of Plaintiff's theory yields the unsupportable result that every conceivable agency action automatically satisfies the second prong, as the agency necessarily "determines" its "right" or "obligation" to take that action, as well as the absence of any affected party's "right" to have the agency not take that action, solely by virtue of taking it.

To illustrate this point, consider an agency action that the Second Circuit recently found did not determine any rights or obligations.  In *Paskar v. United States Department of Transportation*, 714 F.3d 90 (2d Cir. 2013), the Federal Aviation Administration ("the FAA") sent a letter to the New York City Department of Sanitation, in which it referenced a report

_____

failed the first prong, as the agency still had other available enforcement mechanisms that it could pursue.  Importantly, the Department of Education regulation the *New York University* court described in reaching its conclusion is still in effect—indeed, it is the very same regulation that Plaintiff discusses in detail in the section of its Memorandum of Law in which it argues that OCR's issuance of the Letter of Findings was final agency action, and on which it in part bases its argument that such issuance was illegal.  (*See* Pl.'s Mem. 17 & n.8, 18.)

prepared by a panel of experts, which report concluded that a proposed marine trash-transfer station would "be compatible with safe air operations [near LaGuardia Airport] so long as it [was] constructed and operated in accordance with the report's recommendations." *Id.* at 94 (internal quotation marks omitted).  The FAA's letter stated that the FAA had "reviewed the report and believed the . . . panel's approach to the issue presented was appropriate and its analysis and conclusions [were] sound"; that the FAA "believe[d] it [was] important for [New York City] to adopt the recommendations of the panel"; and that the FAA "appreciate[d] [New York City's] undertaking to adopt [the recommendations] in full." *Id.* at 94–95.  The letter also "urge[d] [New York City] to commit to implementing" all of the recommendations. *Id.* at 94 n.8.  The Second Circuit explained its finding that the FAA's issuance of the letter was not final agency action as follows:

> No term in the Letter "imposes an obligation" on the City, "denies a right" of the City, or "fixes some legal relationship" with the City.  The Letter "urge[d]" the City to implement the panel report's recommendations and expressed the sentiment that the recommendations are "important for the city to adopt."  However, there is nothing in the Letter that commands the City to stop, change, or continue construction of the North Shore Station.  A letter advising the City to follow safety recommendations, without more, hardly "fixes a legal relationship."  The City could have accepted or rejected the FAA's recommendations without recourse by any party. . . .

*Id.* at 96 (citation omitted) (first alteration in original).

The Second Circuit's holding that the FAA's issuance of the letter did not determine any rights or obligations was unequivocal.  But if the Second Circuit had applied the reasoning that Plaintiff urges the Court to adopt to those same facts, it would have reached the opposite conclusion.  According to Plaintiff's theory, by issuing the letter, the FAA "determined" that it had the "right" or "obligation" to issue the letter, and also "determined" that interested parties,

44

such as New York City, the Department of Sanitation, and the petitioners, did not have the "right" to have the FAA not issue the letter, thereby satisfying the second prong.

Plaintiff cites only two cases in support of its *petitio principii*, neither of which are from within the Second Circuit, and neither of which helps its cause: *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925 (D.C. Cir. 2008), and *Doe v. Tenenbaum*, 900 F. Supp. 2d 572 (D. Md. 2012), *rev'd sub nom. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014).  (*See* Pl.'s Mem. 26.)

In *Venetian*, "[n]umerous disappointed applicants" for jobs at a hotel and casino operated by Venetian Casino Resorts, L.L.C. ("Venetian") "filed complaints with the [Equal Employment Opportunity] Commission [("the Commission")]," "alleging [that] Venetian had violated various civil rights statutes."  530 F.3d at 927.  "To assist the Commission with its investigation" of certain of those claims, "Venetian supplied the Commission with information that Venetian deemed, and identified as, confidential."  *Id.*  After the Commission issued a subpoena for more documents, and after the Commission subsequently denied the appellant's petition to revoke that subpoena, Venetian sued, arguing that "the Commission's policy, which permit[ted] Commission employees to disclose an employer's confidential information to potential . . . plaintiffs without first notifying the employer that its information [would] be disclosed, violate[d] the [APA], the Freedom of Information Act (FOIA), and the Trade Secrets Act (TSA)."  *Id.*  Venetian also "contended [that] the disclosure policy could not be reconciled with [some of] the Commission's own FOIA regulations."  *Id.*

In the district-court action underlying the appeal, resolution of the appellant's claim had turned in large part on the contents of two different versions of the Commission's Compliance Manual, issued in 1987 and 1992, each of which contained a section related to the release of confidential information.  *Id.* at 928–29.  The district court determined that, although it was not

"definitively clear whether the 1987 or 1992 version [of the Compliance Manual] constitute[d] the official version . . . , Section 83[, the section related to the release of confidential information, was] identical in all material respects in the two versions." *Id.* at 929 (internal quotation marks omitted).  Based in part on the contents of that section, the district court "assumed the [Commission] had a disclosure policy or practice, written or otherwise, that allow[ed] the agency to release documents that the submitting party [had] identified as containing trade secrets and/or confidential material without first notifying the submitting party." *Id.* (alterations and internal quotation marks omitted).  In fact, the Commission "conceded [that] Section 83 [did] not require the Commission to notify submitters before releasing their confidential information, but represented that it had neither released nor decided to release any of Venetian's confidential information." *Id.*  The district court ultimately granted summary judgment on behalf of the Commission, finding that Section 83 "was not arbitrary or capricious in violation of the APA because it did not violate any other statute or regulation." *Id.*

On appeal, the D.C. Circuit noted that, "unlike the district court, [it did] not merely 'assume' the truth of Venetian's allegations" as to the existence of a disclosure policy allowing the Commission to release confidential material without first notifying the submitter, because "[the] truth [of Venetian's allegations had] been established." *Id.*  The court found that, "[a]lthough the details of the Commission's disclosure policy [were] still unclear, the record [left] no doubt" that such a policy existed. *Id.* at 929–30.  "Venetian so asserted in its statement of undisputed facts before the district court and, although the Commission made several ambiguous statements, it never denied Venetian's description of the agency's policy." *Id.* at 930.  Further, "[w]hen directly questioned about the disclosure policy at oral argument, counsel

46

for the Commission conceded employees of the Commission might disclose confidential information without notice[.]"  *Id.*

Nevertheless, the Commission "contend[ed] [that] Venetian's claims are not cognizable under the APA," as "[the Commission's] policy . . . [did] not constitute 'final agency action' and therefore [was] not reviewable pursuant to 5 U.S.C. § 704."  *Id.* at 931.  In support of this argument, the Commission "claim[ed] [that] its Compliance Manual . . . [was] merely a guidance document that [did] not affect its own or the public's legal obligations."  *Id.* The court found this argument to be "misdirected":

> Venetian does not contend the Manual itself is a final agency action.  Rather, Venetian challenges the decision of the Commission to *adopt a policy* of disclosing confidential information without notice.  The Manual is relevant insofar as it illuminates the nature of the policy, but the agency took final action by *adopting the policy*, not by including it in the Manual.
>
> *Adopting a policy* of permitting employees to disclose confidential information without notice is surely a "consummation of the agency's decisionmaking process," and "one by which [the submitter's] rights [and the agency's] obligations have been determined."

*Id.* at 931 (emphasis added) (alterations in original).

It is the above-described passage from *Venetian* that Plaintiff believes to be most relevant to the case before the Court, as evidenced by its reproduction of that passage in the footnotes of its Memorandum of Law.  (*See* Pl.'s Mem. 26 n.18.)  Based on Plaintiff's inclusion of that passage therein, as well as various other statements scattered throughout, it seems as though Plaintiff may be attempting to argue that OCR issued the Letter of Findings pursuant to a *policy* of issuing such letters despite having already entered into resolution agreements with the parties to which such letters are issued, and that in this Action, Plaintiff is challenging both OCR's issuance of the Letter of Findings itself, *as well as this supposed policy*.  (*See id.* at 28

(discussing "the decision to ignore [the provisions of Section 602 of Title VI and its

implementing regulations at 34 C.F.R. §§ 100.7–8] through *adoption and implementation of a*

*policy* of issuing adverse Letters of Finding during, or following the successful completion of,

voluntary resolution efforts" (emphasis added)).)

There are a number of problems with this argument, the most prominent of which is that

Plaintiff does not allege anywhere in its Amended Complaint that it is challenging an OCR

policy, that any such policy is illegal, or that the Letter of Findings was issued pursuant to any

such policy.  In its first claim for relief, Plaintiff argues that "[n]o statute precludes review of

[OCR's] action *complained of in this Complaint*."  (Am. Compl. ¶ 46 (emphasis added).)

Plaintiff then goes on to exclusively describe "[t]he November 17, 2011 determinations of

[OCR] in the Letter of Findings that 'the incident occurred as alleged' and that [Plaintiff's]

'investigation was incomplete and insufficient.'"  (*Id.* ¶ 48; *see also id.* ¶ 49 (same).)  Plaintiff

follows suit in regard to the second claim for relief, exclusively describing "[t]he Letter of

Findings, particularly the determinations therein that 'the incident occurred as alleged' and that

[OCR's] 'investigation was incomplete and insufficient.'"  (*Id.* ¶ 51.)  Additionally, the only

specific relief that Plaintiff requests is that "the Court compel [Defendants] to withdraw and

rescind their determinations that 'the incident occurred as alleged' and that [OCR's]

'investigation was incomplete and insufficient.'" (*Id.* ¶ 51(1).)  No mention is made of any OCR

policy.  In fact, the word "policy" does not appear anywhere in the Amended Complaint.

The absence of any reference to any OCR policy in Plaintiff's Amended Complaint

stands in stark contrast to the plaintiff's allegations in *Venetian*.  There, Venetian alleged that

"the Commission's *policy*, which permit[ted] Commission employees to disclose an employer's

confidential information . . . without first notifying the employer that its information [would] be

disclosed, violate[d]" several statutes.  *Venetian*, 530 F.3d at 927 (emphasis added); *see also id.*
at 931 ("Venetian challenges the decision of the Commission to *adopt a policy* of disclosing
confidential information without notice." (emphasis added)).

      Furthermore, not only does Plaintiff fail to allege in its Amended Complaint that it is
challenging any OCR policy—Plaintiff actually appears to allege that OCR's issuance of the
Letter of Findings was wrongful in part because it *violated* OCR policy.  (*See* Am. Compl. ¶ 12
("The OCR Complaint Processing Procedures . . . did not state that an adverse letter of findings
could or might be issued in the event that a charged party like [Plaintiff] expressed an interest in
resolving the complaint and entered into a resolution agreement before the investigation was
completed."); *id.* ¶ 13 ("Even in the event of a resolution agreement being entered into after a
determination of noncompliance was made by . . . OCR, the OCR Complaint Processing
Procedures provided by . . . OCR to [Plaintiff] did not indicate that the determination of
noncompliance could result in an adverse letter of finding. *To the contrary, it clearly
communicated that such a letter was only to be issued in the event that negotiations at reaching
a resolution agreement fail.*" (emphasis added)); *id.* ¶ 38 ("When [OCR] issued an adverse
finding against [Plaintiff] on November 17, 2011, it violated . . . [the CPM].""); Pl.'s Mem. 3
("The OCR Complaint Processing Procedures . . . did not state that an adverse Letter of Findings
could or might be issued in the event that a charged party like [Plaintiff] expressed an interest in
resolving the complaint and thereupon entered into negotiations toward a resolution agreement
before the investigation was completed. *It implied the contrary.*" (emphasis added)); *id.* ("Even
in the event of a resolution agreement being entered into after a determination of noncompliance
was made by . . . OCR, the OCR Complaint Processing Procedures . . . *clearly* communicated
that [a Letter of Findings] was *only* to be issued in the event that negotiations at reaching a

resolution agreement failed." (emphasis added)).  Thus, whereas in *Venetian*, the court looked to the Commission's Compliance Manual as evidence of the existence of the Commission policy that the plaintiff was challenging, if the Court were to look to OCR's internal guidelines for such evidence here, its efforts would be fruitless, at least based on Plaintiff's characterization of the relevant documents.

Therefore, while OCR's adoption of a policy of issuing Letters of Findings despite having already entered into resolution agreements with the parties to which such letters are issued might be a "determination of rights or obligations" that Plaintiff could have sought to challenge in its Amended Complaint, it is not the "determination of rights or obligations" that Plaintiff actually challenges therein.  While the Court will provide Plaintiff with the opportunity to amend its Complaint for a second time should it wish to include such a challenge to this supposed policy, "[i]t is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs."  *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y.), *aff'd*, 157 F. App'x 398 (2d Cir. 2005); *see also Strobel v. RJM Acquisitions LLC*, No. 13-CV-2467, 2014 WL 507510, at *5 (E.D.N.Y. Feb. 6, 2014) (granting the defendant's motion for judgment on the pleadings where, "[i]n opposing Defendant's motion, . . . Plaintiff subtly attempt[ed] to amend her allegation" by making a new argument not contained in her complaint); *cf. Burbar v. Inc. Vill. of Garden City*, No. 13-CV-1350, 2013 WL 4427810, at *5 (E.D.N.Y. Aug. 19, 2013) ("In his opposition to the motion to dismiss, the Plaintiff contends, for the first time, that the police officers arrested him, not to enforce a criminal possession charge, but to improperly regulate the way in which the plaintiff possessed the weapons.  These allegations are nowhere to be found in the complaint and the Plaintiff may not amend his complaint through motion papers and the Court will not consider this newly raised

50

claim." (citation and internal quotation marks omitted)); *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 322 (S.D.N.Y. 2012) ("Implicitly conceding the weakness of his contract claim, [the plaintiff] argues in his memorandum of law opposing the Defendants' motion to dismiss that this Court should treat his breach-of-contract claim as a claim for promissory estoppel.  A party may not defeat a motion to dismiss a contract claim, however, by recasting the claim as one for promissory estoppel." (citation omitted)).[9]

The only other case that Plaintiff cites in support of its argument is *Doe v. Tenenbaum*, 900 F. Supp. 2d 572 (D. Md. 2012), *rev'd sub nom. Doe v. Pub. Citizen*, 749 F.3d 246 (4th Cir. 2014), which the Fourth Circuit reversed in the time between Plaintiff's filing of its Memorandum of Law and the Court's issuance of this Opinion, albeit on grounds not relevant here.  In that case—which, it should be noted, has never been cited by any court within the Second Circuit for any reason—a company sued the Consumer Product Safety Commission ("CPSC") and its chairwoman, claiming that the CPSC's "decision to publish a report implicating Plaintiffs [sic] product . . . [was] arbitrary and capricious, an abuse of discretion, in excess of its statutory authority, and otherwise not in accordance with the law."  *Id.* at 575.[10]

--------

[9] The Court also notes that, in the Letter of Findings itself, OCR stated the following:

This letter sets forth OCR's determination in an individual OCR case.  *This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.*  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

(Resolution Agreement 3–4 (emphasis added).)

[10] Given that the district court's opinion is replete with redactions, it is almost impossible to grasp the complete factual background in *Tenenbaum*.  On this subject, in April of this year, the Fourth Circuit noted the following in reversing the district court's decision:

[T]he [district] court released its memorandum opinion on the public docket with

The statute at issue in the dispute was "the Consumer Product Safety Improvement Act of 2008 ('CPSIA'), Pub. L. No. 110–314, 122 Stat. 3016 (2008)," through which Congress "sought to establish consumer product safety standards and other safety requirements for children's products and to reauthorize and modernize the [CPSC]."  *Id.* (internal quotation marks omitted). The specific section of the CPSIA to which the parties' dispute primarily related was Section 212, which "requires the [CPSC] to establish and maintain a database on the safety of consumer products that is—(A) publicly available; (B) searchable; and (C) accessible through the Internet website of the [CPSC]." *Id.*  (internal quotation marks omitted).  "[T]he database must include [r]eports of harm relating to the use of consumer products . . . that are received from . . . local . . . government agencies."  *Id.* (second, third, fourth, and fifth alterations in original) (internal quotation marks omitted).

"The Parties' dispute trace[d] to the [CPSC's] planned publication of a report" related to the company.  *Id.* at 576.  The company "argued in a letter [to the CPSC] that the report was materially inaccurate within the meaning of the CPSIA and demanded that the [CPSC] refrain from publishing it," "pursuant to CPSIA provisions empowering manufacturers to contest the publication of reports on the grounds that they contain materially inaccurate information."  *Id.*

---

sweeping redactions to virtually all of the facts, expert testimony, and evidence supporting its decision.

. . . .

. . . .  [W]e hold that the district court's sealing order violates the public's right of access under the First Amendment and that the district court abused its discretion in allowing Company Doe to litigate pseudonymously.  Accordingly, we vacate in part, reverse in part, and remand to the district court with instructions to unseal the case in its entirety.

*Doe v. Pub. Citizen*, 749 F.3d 246, 252–53 (4th Cir. 2014).

(internal quotation marks omitted) (citing 15 U.S.C. § 2055(c)).  The CPSC agreed, notifying the company "that the information in the incident report that [the company] identified as materially inaccurate met the definition of materially inaccurate information in" the relevant regulation.  *Id.* "In a bid to rid the report of the material inaccuracy, the [CPSC] thus redacted it[.]"  *Id.*  But the company argued that the second version of the report "compounded the first report's inaccuracy."  *Id.*  The CPSC subsequently "tried to purge the report of its material inaccuracy" once again, "producing a third iteration."  *Id.*  Finding this third version equally unsatisfactory, the company filed a complaint at the district court, seeking to enjoin the CPSC from publishing the report, on the grounds that it was "baseless and inflammatory," and that "its publication, besides being unlawful, would cause irreparable harm to its reputation and financial well-being." *Id.* at 576–77.  The company grounded most of its claims in the APA.  *Id.* at 577 (noting that the company argued that publication of the report violated 5 U.S.C. §§ 706(2)(A) and (C)).

The CPSC argued that its decision to publish the report "lack[ed] finality," in part because it "confer[red] no rights or obligations on [the company]."  *Id.* at 602.  The court rejected this argument:

> The assertion that the report confers no rights or obligations on [the company] misstates the second prong of the test for finality.  The second prong does not require that the agency action confer rights or obligations on the plaintiff.  Rather, the action must be one by which rights or obligations have been determined.  The [CPSC] appears to construe this liberal language for the restrictive proposition that the decision must determine [the company's] lights [sic] or obligations, as opposed to the [CPSC's], for it to count as final.  This self-serving interpretation runs counter to the literal language of *Bennet* [*v. Spear*, 520 U.S. 154 (1997)].  As enunciated in *Bennett*, an equally apposite question is whether the [CPSC's] decision that the report is publishable determined its own rights or obligations.  Of course it did.  It marked the consummation of the [CPSC's] statutory and regulatory obligation to determine, through informal adjudication, whether to publish the report.
>
> The Commission's decision also determined [the company's] right to keep a materially inaccurate report regarding [redacted] off of the database.  In essence, the

> Commission's regulations allow it to take only two steps when it grants a material inaccuracy claim: (1) to decline to publish the report or (2) correct the report and publish it.  Where, as here, the [CPSC] takes the second step and the report still contains materially inaccurate information, such action determines [the company's] statutorily and regulatorily spawned right to prevent publication of the materially inaccurate information.  Accordingly, the [CPSC's] action would satisfy the second prong even if *Bennett* and its progeny invariably required the challenged action to determine the plaintiff's rights instead of the agency's.

*Id.* at 602–03 (alterations, some citations, and internal quotation marks omitted).

The court's finding that the CPSC's decision to issue the report determined rights and obligations was in large part driven by the specific legal framework applicable to that case.  The court's reasoning could be paraphrased in the following manner.  The CPSC has a "statutory and regulatory obligation to determine, through informal adjudication, whether to publish the report."  *Id.* at 603.  In other words, under certain circumstances, the CPSC is obligated to publish a report, while under different circumstances, it is not.  Thus, by concluding that the circumstances presented in that case fell within the former category, the CPSC made a determination as to one of its obligations.  Similarly, the court also noted that the company had a statutory right to "contest the publication of reports on the grounds that they contain materially inaccurate information."  *Id.* at 576.  Thus, by concluding that it was obligated to publish the report, CPSC also necessarily determined that the report was not materially inaccurate after having been redacted, thereby also determining that the company's statutory right to prevent the publication of materially inaccurate information did not apply in that situation.

The Court takes no position on whether it finds this reasoning persuasive.  It merely notes that the specific legal framework on which that reasoning appears to have been based is entirely different from that presented here.  While the *Tenenbaum* court's conclusion depended on the CPSC's statutory and regulatory obligation to publish reports under certain circumstances,

and the company's statutory right to prevent the publication of reports under others, Plaintiff has not pointed to any comparable statutory or regulatory obligations or rights that would require OCR to issue letters of findings or entitle Plaintiff to prevent their issuance where Plaintiff had "already entered into a resolution agreement."  (Pl.'s Mem. 25–26.)  Rather, as noted above, in this regard, Plaintiff points only to provisions of OCR's Complaint Processing Procedures and the CPM.  (*See* Am. Compl. ¶¶ 12–13.)  But, unlike the statutes and regulations on which the *Tenebaum* court based its holding, both of these documents lack the force of law.  *Cf. Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (noting that "agency manuals . . . lack the force of law"); *Cruz-Miguel v. Holder*, 650 F.3d 189, 200 (2d Cir. 2011) (noting that Immigration and Naturalization Services "internal guidance documents are not binding agency authority"); *Natural Res. Def. Council, Inc. v. F.A.A.*, 564 F.3d 549, 564 (2d Cir. 2009) (describing certain FAA orders "as agency manuals without the force of law"); *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1251 (2d Cir. 1992) ("It is clear that the internal procedures manual of an executive agency does not create due process rights in the public." (alterations and internal quotation marks omitted)); *United States v. N.Y. Tel. Co.*, 644 F.2d 953, 959 n.10 (2d Cir. 1981) ("An [Internal Revenue Service] manual of course does not have the effect of law . . . .").

In short, *Tenenbaum* is of little help to Plaintiff's position.  To the extent that the line in *Tenenbaum* that the CPSC's decision to publish the report "marked the consummation of the [CPSC's] statutory and regulatory obligation to determine, through informal adjudication, whether to publish the report," *id.* at 602, could be read to support Plaintiff's circular argument that any agency action satisfies the second prong of the finality test because it constitutes the agency's "determination" that it has the "right" or "obligation" to take that action, and the lack

of any affected parties' "right" to have the agency not take that action, the Court finds *Tenenbaum* unpersuasive, for reasons previously described.

The Court therefore rejects Plaintiff's argument that, by issuing the Letter of Findings, OCR "determined" any "rights" or "obligations" under the finality test's second prong.

### b.  "From Which Legal Consequences Will Flow"

Plaintiff next argues that, "[h]aving satisfied the 'one by which the rights or obligations have been determined' requirement for agency action to be deemed 'final,' [Plaintiff] need not also establish that 'legal consequences' will flow from that action," but that "[i]n any event, however, they do."  (Pl.'s Mem. 26–27.)  Plaintiff puts forth two arguments on this point:

> The fact that the Letter of Findings critical of [Plaintiff's] investigation of the alleged incident at the basketball game is subject to disclosure through the federal and New York State freedom of information laws, as well as that OCR's findings would be admissible at trial were the parent or student to commence an action under Title VI against [Plaintiff] would make . . . OCR's action one "from which legal consequences will flow."

(Pl.'s Mem. 27.)  Plaintiff cites to two cases in support of these arguments: *Doe v. New York University*, 511 F. Supp. 606, 610 (S.D.N.Y. 1981), and *Tenenbaum*, 900 F. Supp. 2d at 602–03. (Pl.'s Mem. 27.)[11]

As to Plaintiff's first argument, it has not provided the Court with any basis to conclude that the Letter of Findings would, in fact, be "subject to disclosure through the federal and New York State freedom of information laws."  (Pl.'s Mem. 27.)  The Resolution Agreement merely states that "it *may* be necessary to release [the Letter of Findings] and related correspondence and records upon request" "[u]nder the [federal] Freedom of Information Act, 5 U.S.C. § 552,"

---

[11] Plaintiff cites to the Westlaw citation for *Tenenbaum*, 2012 WL 5245523, at *29, which corresponds to pages 602–03 of the Federal Supplement citation.  (*See* Pl.'s Mem. 27.)

an equivocal statement that does not address the federal law's New York state equivalent. (Resolution Agreement 4 (emphasis added).)

But even assuming that the Letter of Findings would be subject to disclosure, Plaintiff did not cite to, and the Court was not able to locate, any authority suggesting that just because the product of an agency action, such as a letter of findings, is discoverable under federal or state freedom-of-information laws, "legal consequences flow" from that action under the finality test's second prong.  Neither *New York University* nor *Tenenbaum* holds as much.  *New York University* does not mention freedom-of-information laws even in passing, while *Tenenbaum* does so only in the context of its characterization of the holding in *Venetian*, 530 F.3d 925, discussed above.  *See Tenenbaum*, 900 F. Supp. 2d at 603 (describing *Venetian* as "holding that the EEOC's adoption of a policy permitting the disclosure of confidential information about the plaintiff without notice in conjunction with FOIA requests satisfied the second prong as it determined the agency's obligation to disclose the information to the submitter" (emphasis removed)).

Plaintiff's second argument suffers from similar defects.  Plaintiff provides only the most minimal support for its assertion that "OCR's findings would be admissible at trial were the parent or student to commence an action under Title VI."  (Pl.'s Mem. 27.)  That support comes from *New York University*, in which the court held that certain findings and recommendations made by the Department of Health, Education and Welfare ("HEW") and the Department of Education ("Education"), in which HEW and Education concluded that New York University had violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, "[would] be admissible at trial and [would] be entitled to considerable weight."  511 F. Supp. at 610.  However, while the Court is unaware of any Second Circuit decision specifically addressing the admissibility of

OCR findings at trial, almost 20 years after *New York University* was decided, the Second

Circuit specifically rejected the notion that "findings of the [Equal Employment Opportunity

Commission ("EEOC")] or equivalent state agencies must, *as a matter of law*, be admitted in

subsequent trials" to prove wrongdoing.  *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 64

(2d Cir. 1998) (emphasis added); *see also Chisholm v. Sloan-Kettering*, No. 09-CV-8211, 2011

WL 2015526, at *2 (S.D.N.Y. May 13, 2011) (noting that "findings of the EEOC may be

excluded").  The Second Circuit based this holding on the fact that such findings "are not

homogeneous products; they vary greatly in quality and factual detail."  *Paolitto*, 151 F.3d at 65

(internal quotation marks omitted).  Accordingly, the Second Circuit concluded that "the district

court is in the best position to consider the quality of the report, its potential impact on the jury,

and the likelihood that the trial will deteriorate into a protracted and unproductive struggle over

how the evidence admitted at trial compared to the evidence considered by the agency," all of

which factors would inform a district court's decision whether to admit the findings under Rule

403 of the Federal Rules of Evidence.  *Id.* at 65 (citing Fed. R. Evid. 403).[12]

It seems likely that a district court would be required to consider the same factors when

considering the admissibility of OCR findings at trial, such as the determinations contained in

the Letter of Findings at issue here.  *Cf. U.S. ex rel. Feldman v. van Gorp*, No. 03-CV-8135,

---

[12] It is worth noting that the *New York University* court appears to have conducted its
admissibility analysis exclusively within the context of Rule 803(8)(iii) of the Federal Rules of
Evidence, which exempts from Rule 801's general proscription against hearsay "[a] record or
statement of a public office if . . . it sets out . . . in a civil case . . . , factual findings from a
legally authorized investigation,"  Fed. R. Evid. 803(8)(iii), but does not appear to have
considered Rule 403's implications.  *See N.Y. Univ.*, 511 F. Supp. at 610.  Thus, *Paolitto* did not
implicitly vacate *New York University*—rather, *Paolitto* simply stands for the proposition that,
even if the hearsay rules would not preclude the admission into evidence of agency findings such
as those at issue here, that does not mean that Rule 403 would not do so.

2010 WL 2911606, at *3 (S.D.N.Y. July 8, 2010) (declining to admit the Department of Education's inaction in response to certain complaints as evidence that those complaints lacked merit, on the grounds that, "even where public agency determinations may be marginally relevant, the district court has discretion to exclude them on Rule 403 grounds" (citing *Paolitto*, 151 F.3d at 64–65)).  But Plaintiff has not suggested any reason why consideration of those factors in this case would favor the Letter of Findings' admission.

What is more, there is at least one case from within the Second Circuit suggesting that, under the specific factual circumstances presented here, the Letter of Findings might, as a matter of law, be inadmissible.  In *United States v. Yonkers Board of Education*, 624 F. Supp. 1276 (S.D.N.Y. 1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987), a school district's "disproportionate referral of minority students to Special Education programs . . . eventually became the subject of investigations by state education officials and [OCR]," which "investigations culminated in findings reaffirming that such disproportion did in fact exist and . . . was the result of methods of [discriminatory] administration."  *Id.* at 1460.  OCR and the school district eventually "reached an agreement whereby the [school district] undertook to implement certain remedial measures relating to the operation of its Special Education program," measures which, "[a]ccording to [OCR], . . . if fully implemented, would ensure compliance with Title VI and the regulations thereunder."  *Id.*

The school district later "argue[d] that the consensual resolution of [OCR's] charges regarding the district's Special Education program should preclude inquiry into the program as it existed prior to this resolution."  *Id.* at 1460 n.121.  The court agreed that, at least "with respect to the United States, the fact that the aforementioned allegations were consensually resolved [could not] be relied upon by [the] [c]ourt as independent evidence of wrongdoing," and that

59

such resolution could have "eventually preclude[d] the United States from challenging the sufficiency of the previously agreed-upon remedial measures during the remedial phase of [the] case." *Id.*  Thus, although the court's holding was arguably limited to claims asserted by the United States against the school district, the general principle behind the holding was that, where an agency makes findings that a party engaged in wrongdoing, but then reaches an agreement with that party whereby the party agrees to remedy the wrongdoing in question, the agency's findings may not be considered subsequently to prove the party's wrongdoing.  Applying this principle to the case before the Court, although OCR's Letter of Findings included determinations that Plaintiff engaged in wrongdoing, because OCR and Plaintiff reached an agreement whereby Plaintiff agreed to remedy the alleged wrongdoing, those determinations might be inadmissible at trial if the complainant or her son were to commence an action under Title VI against Plaintiff.

The Court makes no finding as to whether those determinations would or would not be admissible under such circumstances on the basis of the principle described in *Yonkers*.  The point is simply that, despite Plaintiff's conclusory assertions to the contrary, the admissibility of the Letter of Findings at trial cannot be assumed.  It is entirely possible that it would be excluded under Rule 403 or on other grounds.

Regardless, there is a much more significant problem with Plaintiff's second argument. As was the case in regard to its first argument, Plaintiff has not provided the Court with any authority suggesting that, just because the product of an agency action such as a letter of findings would be admissible at trial, "legal consequences flow" from that action under the second prong.

Neither *New York University* nor *Tenenbaum* provide any support for that proposition, and the Court has been unable to find any other cases that do.[13]

Indeed, if admissibility were the test, the definition of final agency action would be immeasurably expanded. By way of example, take once again the FAA letter at issue in *Paskar*, 714 F.3d 90. To recapitulate, the Second Circuit held that no legal consequences flowed from that letter. *Id.* at 97. But arguments could certainly be made that the letter would be admissible at trial, for either the truth of the matter asserted or any other proper non-hearsay purpose. *See* Fed. R. Evid. 803(6) (describing as "not excluded by the rule against hearsay" "[a] record of an . . . opinion . . . if . . . the record was kept in the course of a regularly conducted activity of a[n] . . . organization"); *N.Y. ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 426 (S.D.N.Y. 2000) (admitting a letter sent by the New York State Department of Health to a third party describing the Department's position on an issue for the truth of the matter asserted under Rule 803(6)).[14] Such a test would also pose significant practical problems, as a court's determination of whether an agency action was final would be wedded to a necessarily speculative evidentiary ruling. *Cf. Franklin v. Consol. Edison Co. of N.Y., Inc.*, No. 98-CV-2286, 2000 WL 1863767, at *1 (S.D.N.Y. 2000) (reserving decision on the admissibility of certain documents on the grounds that "the context of the trial [would] render[] more apparent whether they [were] sufficiently relevant and probative"), *aff'd*, 37 F. App'x 12 (2d Cir. 2002).

---

[13] In *New York University*, the court discussed the admissibility of the HEW/Education findings and recommendations in the context of the plaintiff's motion to shift the burden of proof from her to the defendant. 511 F. Supp. at 610. *Tenenbaum* does not discuss the admissibility of the products of agency action at all.

[14] The same argument could be made in regard to Rule 803(8)(iii) of the Federal Rules of Evidence, which was the basis for the *New York University* court's conclusion that the letter of findings in that case would be admissible. *See supra* note 12.

Thus, because Plaintiff does not cite to, nor is the Court aware of, any authority suggesting that "legal consequences flow" from an agency action under the finality test's second prong merely because its product would be discoverable under a federal or state freedom-of-information law or admissible at trial, the Court finds that Plaintiff has not demonstrated that OCR's issuance of the Letter of Findings satisfies the second prong under this theory.

### c.  Non-Statutory Exception to the APA's Finality Requirement

Plaintiff also argues that, "even assuming *arguendo* that the Court were to find that [OCR's] decision to issue the adverse Letter of Findings . . . did not constitute 'final agency action' . . . , that decision would nonetheless be reviewable," because "in issuing the adverse Letter of Findings to [Plaintiff], OCR has acted outside the scope of its delegated powers and contrary to the clear and mandatory statutory proscription at section 602 of Title VI," (Pl.'s Mem. 29), which reads as follows:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.  No such rule, regulation, or order shall become effective unless and until approved by the President.

> Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law:

> *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by

62

voluntary means.  In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action.  No such action shall become effective until thirty days have elapsed after the filing of such report.

42 U.S.C. § 2000d-1.

Plaintiff highlights language from the third paragraph described above: "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means."  (Pl.'s Mem. 29 (internal quotation marks omitted).)  According to Plaintiff, OCR's alleged violation of this part of Section 602 triggers the "well-established," "non-statutory exception to the finality requirement in the APA" for "agency action . . . taken in excess of the agency's delegated powers and in contravention of a clear and mandatory statutory mandate."  (*Id.*)

Plaintiff refers to an exception to the finality requirement first recognized by the Supreme Court in *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958) (invalidating an agency's "attempted exercise of [a] power that had been specifically withheld" in the statute).  The Second Circuit most recently discussed this exception 25 years ago, in *Goethe House New York, German Cultural Center v. National Labor Relations Board*, 869 F.2d 75, 77 (2d Cir. 1989) (noting that the exception is "extremely narrow" and "applies only where the [agency] has clearly violated an express provision of [a] statute" (internal quotation marks omitted)).  However, more recently, the Fourth Circuit has explained that, "[i]n *Leedom*, the Supreme Court recognized a nonstatutory exception to the § 704 finality requirement in which agencies act outside the scope of their delegated powers and contrary to clear and mandatory statutory provisions."  *Long Term*

63

*Care Partners, LLC v. United States*, 516 F.3d 225, 233 (4th Cir. 2008) (internal quotation

marks omitted); *see also Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994) ("A

claim that an agency action is in plain contravention of a statutory mandate . . . may present one

of the extraordinary exceptions to the finality requirement."); *Pub. Citizen v. Office of U.S.*

*Trade Representatives*, 970 F.2d 916, 922 (D.C. Cir. 1992) ("A federal court may take

jurisdiction before final agency action only in a case of clear right such as outright violation of a

clear statutory provision . . . ." (alterations, citation, and internal quotation marks omitted));

*Greater N.Y. Hosp. Ass'n v. United States*, No. 98-CV-2741, 1999 WL 1021561, at *7 (S.D.N.Y.

Nov. 9, 1999) ("A claim, that an agency action is in plain contravention of a statutory mandate . .

. may present one of the extraordinary exceptions to the finality requirement." (internal quotation

marks omitted)).

Importantly, a number of courts have cautioned that *Leedom* "provides an exception of

very limited scope, to be invoked only in exceptional circumstances." *Farrell-Cooper Mining*

*Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1238 (10th Cir. 2013) (internal quotation marks

omitted); *see also Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 639 n.6 (D.C.

Cir. 2013) (noting that "the agency error must be so extreme that one may view it as

jurisdictional or nearly so" (internal quotation marks omitted)); *Paladin Cmty. Mental Health*

*Ctr. v. Sebelius*, 684 F.3d 527, 532 (5th Cir. 2012) (noting that *Leedom* permits a district court

"to conduct a cursory review of the merits of the case to determine whether the [agency] violated

a clear statutory mandate" (internal quotation marks omitted)).  Indeed, "a *Leedom v. Kyne* claim

is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt*

*v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Although it is not entirely clear from its Memorandum of Law, Plaintiff's argument appears to be that OCR's issuance of the Letter of Findings falls within the second category by which compliance with Title VI may be affected—"by any other means authorized by law"—and that as a result, OCR violated Section 602 by failing to "advise[] [Plaintiff] of [its] failure to comply with [Title VI]," and by failing to "determine[] that compliance [could not] be secured by voluntary means."  42 U.S.C. § 2000d-1.

A number of untenable assumptions are built into this argument—namely, that OCR's issuance of the Letter of Findings was enforcement action subject to the requirements of Section 602.  Defendants lay out the fundamental flaw inherent in this assumption:

> Plaintiff appears to conflate the issuance of a findings letter with initiating enforcement action, such that OCR must, before issuing a findings letter, also advise the recipient and determine that voluntary compliance is not possible.  Plaintiff thus appears to construe the phrase "no such action" in Section 602 as referring to *any* action taken by [OCR], rather than to enforcement proceedings by which [OCR] seeks to compel compliance with Title VI.  This is contrary to the plain language of Section 602.
>
> Because the parties entered into, and [Plaintiff] fully complied with, a voluntary resolution agreement, [OCR] did not commence enforcement proceedings to compel compliance with Title VI.  As a result, consistent with Section 602, the complaint was resolved voluntarily.  Section 602's requirement that [OCR] advise [Plaintiff] of impending enforcement action and determine that voluntary compliance was not possible, was never triggered.  Moreover, in accordance with its regulation, OCR issues a letter of finding at the conclusion of every investigation—even those that, as here, are resolved voluntarily.

(Defs.' Mem. 25 (alterations, citations, and some internal quotation marks omitted).)

Plaintiff has not provided any factual or legal basis for the Court to conclude that OCR's issuance of the Letter of Findings two days *after* OCR and Plaintiff entered into the Resolution Agreement was action designed to effect compliance with Title VI.  In fact, the CPM, a document on which Plaintiff relies so heavily in its Amended Complaint in arguing that OCR's

65

actions were wrongful, states that a "complaint will be considered *resolved* and the recipient

deemed *compliant* if the recipient enters into an agreement that, fully performed, will remedy the

complaint."  (Am. Compl. ¶ 18 (some emphasis removed) (citing CPM § 304).)  Plaintiff appears

to agree—in its words, the Letter of Findings was issued "days after [Plaintiff] and OCR had

entered into a Resolution Agreement *resolving* a complaint filed against [Plaintiff]."  (Pl.'s

Mem. 1 (emphasis added).)  Thus, compliance was effected the moment Plaintiff entered into the

Resolution Agreement—which, again, took place *before* the Letter of Findings was issued.

   Plaintiff's attempts to characterize OCR's issuance of the Letter of Findings as action

designed to effect compliance with Title VI therefore fall short.  OCR presumably does not

engage in action designed to effect compliance after compliance has already been effected.  In

any event, the Court need not conclude that Defendants' interpretation of Section 602 is

indisputably correct to find *Leedom*'s "extraordinary exception" inapplicable—the mere fact that

Defendants have raised "plausible," "compelling," or "colorable" arguments suffices.  *See Long

Term Care Partners*, 516 F.3d at 234 ("If the agency offered a plausible interpretation of the

relevant statute, we will find that it did not violate a clear statutory mandate, and *Leedom*

jurisdiction will not lie." (citation and internal quotation marks omitted)); *Nat'l Air Traffic

Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006)

("Both [parties] have raised compelling arguments regarding the proper interpretation of the

disputed statutory provisions.  It is precisely because of this that we cannot conclude that the

[agency's] decisions in this case contravened a clear and specific statutory mandate, as required

by *Leedom*."); *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 43 (D.D.C. 2013) ("District court

review under the *Leedom* doctrine . . . . is not appropriate if the agency's interpretation is a

colorable reading of the statute, even if that reading is not the only one possible." (internal quotation marks omitted)).

Plaintiff's efforts to invoke *Leedom* also fail for a second, independent reason. As noted above, in its Memorandum of Law, Plaintiff argues that *Leedom* applies because OCR violated Section 602. But Plaintiff does not allege that OCR violated Section 602 anywhere in its Amended Complaint. In fact, at no point in the Amended Complaint does Plaintiff even mention Section 602 or the language therefrom.[15] Thus, Plaintiff's Hail Mary pass falls incomplete.[16]

---

[15] The closest that Plaintiff comes is through its allegation that, "[w]hen [OCR] issued an adverse finding against [Plaintiff] on November 17, 2011, *it violated the enforcement procedures of Title VI of the Civil Rights Act of 1964*, its implementing regulation at 34 C.F.R. Part 100, and its *Case Processing Manual*." (Am. Compl. ¶ 38 (some emphasis added); *see also id.* ¶ 4 ("Title VI not only requires [Plaintiff] to enforce [Title VI], but also sets forth specific enforcement procedures, which were arbitrarily and capriciously violated in this case.").) But this "vague allegation that the Letter of Finding[s] somehow violated the enforcement provisions of Title VI," (Defs.' Mem. 24 (internal quotation marks omitted)), is insufficiently specific. Indeed, Section 602 is not Title VI's only enforcement procedure. *See generally Lane v. Pena*, 518 U.S. 187, 207 (1996) ("The compliance mechanisms defined in Title VI include remedies, procedures, and rights applicable to the providers of federal financial assistance as well as to the recipients of such assistance." (citing 42 U.S.C. §§ 2000d-1)). In its Amended Complaint, as opposed to its Memorandum of Law, Plaintiff has thus "fail[ed] to identify the specific sections of [this] lengthy statute that [D]efendants purportedly violated or to articulate with specific factual allegations how they did so," which means that Plaintiff would have "failed to comply even with [the] liberal *pro se* pleading rules," which are of course inapplicable here, as Plaintiff is represented by counsel. *Johnson v. Wash. Mut. Bank*, No. 09-CV-5435, 2011 WL 3418362, at *4 (E.D.N.Y. July 12, 2011), *adopted in part and rejected in part on other grounds by* 2011 WL 3420425 (E.D.N.Y. Aug. 3, 2011).

[16] Towards the end of Plaintiff's Memorandum of Law, it claims that, even if OCR's issuance of the Letter of Findings was not final agency action, that action is still reviewable because it "constituted a denial to [Plaintiff] of procedural and substantive due process." (Pl.'s Mem. 29.) Plaintiff is correct that Defendants' Motion To Dismiss "seems to be addressed to [Plaintiff's] First (APA) Claim for Relief in the Amended Complaint and[,] apart perhaps for the standing issue, does not seem to address whatsoever [Plaintiff's] Second (5th Amendment) Claim for Relief in the Amended Complaint." (*Id.* at 2.) Accordingly, the Court will not address those claims in this Opinion. However, the Court pauses to flag an issue that may become extremely important at a later date.

III.  CONCLUSION

For the reasons given herein, the Court finds that Plaintiff has standing, but that the APA precludes this Court's review of Plaintiff's APA claims, as OCR's issuance of the Letter of Findings was not a final agency action, and no exception to the APA's finality requirement applies.  However, because this result was dictated in part by deficiencies in Plaintiff's Amended Complaint, Plaintiff will be given one final opportunity to amend.  Should it choose to file a Second Amended Complaint, Plaintiff must do so within 30 days of the issuance of this Opinion. Should Plaintiff fail to do so, the Court will dismiss its APA claims with prejudice.

---

As described above, the only asserted basis for Plaintiff's standing in this Action is the reputational harm that it allegedly suffered as the result of OCR's issuance of the Letter of Findings.  (*See* Pl.'s Mem. 1, 10.)  But as the Second Circuit has held, "[a] person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause." *Patterson v. City of Utica*, 370 F.3d 322, 329–30 (2d Cir. 2004) (citing, *inter alia*, *Paul v. Davis*, 424 U.S. 693, 701 (1976)); *see also Chrebet v. Cnty. of Nassau*, — F. Supp. 2d —, 2014 WL 2527225, at *8 (E.D.N.Y. June 5, 2014) (describing this principle as "axiomatic"); *DeMartino v. New York*, No. 12-CV-3319, 2013 WL 3226789, at *7 (E.D.N.Y. June 24, 2013) (applying this principle in the context of a plaintiff's claim that certain government agencies' criminal and administrative proceedings against him caused him reputational harm).  The same holds true as to the Due Process Clause's substantive protections.  *See Giammatteo v. Newton*, 452 F. App'x 24, 29–30 (2d Cir. 2011) ("To the extent the Constitution confers a substantive due process right to be free from arbitrary government action, the right is limited to arbitrary government action *that infringes a protected right.*  Action that merely harms one's professional or business interests does not, alone, infringe a federally-protected right, and thus does not implicate due process." (citation and internal quotation marks omitted)); *Dellate v. Great Neck Union Free Sch. Dist.*, No. 09-CV-2567, 2010 WL 3924863, at *10 (E.D.N.Y. Sept. 30, 2010) ("To state a claim for substantive due process violations, a plaintiff must first establish that he has a protected liberty interest in the exercise of such purported right. . . .  Damage to an employee's reputation brought about by an employer's stigmatizing comments standing alone, however, is a matter properly vindicated under state tort law, and does not rise to a deprivation of a constitutional right." (internal quotation marks omitted)), *aff'd sub nom. Dellate v. Great Neck Union Free Sch. Dist.*, 448 F. App'x 164 (2d Cir. 2012).  It thus appears as though Plaintiff's due-process claims may be vulnerable to attack on these grounds.  Nevertheless, because Defendants did not raise this issue in their Memorandum of Law, the Court will not rule on it at this time.

Accordingly, Defendants' Motion To Dismiss is granted.  The Clerk is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 30.)

SO ORDERED.

Dated:        September  5    , 2014
              White Plains, New York

                                          KENNETH M. KARAS
                                          UNITED STATES DISTRICT JUDGE

69