UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PEARL RIVER UNION FREE SCHOOL DISTRICT,

       Plaintiff,

    -v-

JOHN KING, JR., as SECRETARY OF THE
DEPARTMENT OF EDUCATION, and UNITED
STATES DEPARTMENT OF EDUCATION,
OFFICE FOR CIVIL RIGHTS,

       Defendants.[1]

Case No. 12-CV-2938 (KMK)

OPINION & ORDER

---

Appearances:

Mark Craig Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY
*Counsel for Plaintiff*

Jennifer Ellen Blain, Esq.
United States Attorney's Office
Southern District of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff Pearl River Union Free School District ("Plaintiff") brings this action against

Defendants John King, Jr., as Secretary of the United States Department of Education (the

"Department"), and the United States Department of Education's Office for Civil Rights

---

[1] Plaintiff names Arne Duncan, former Secretary of the Department of Education, as a defendant. Arne Duncan resigned in 2015, and John King, Jr. succeeded him as Secretary. Pursuant to Federal Rule of Civil Procedure 25(d), John King, Jr. is substituted as the named Defendant, and the Clerk of Court is respectfully directed to amend the caption as set forth above.

("OCR") (collectively, "Defendants"), alleging that OCR's issuance of a Letter of Findings

providing its determinations regarding an alleged incident of racial harassment reflects an

unwritten policy of issuing Letters of Findings before completing relevant investigations.

Plaintiff claims that the issuance of the Letter of Findings here was therefore arbitrary and

capricious, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. (the

"APA").  Defendants move to dismiss the Second Amended Complaint on the grounds that

Plaintiff fails to state a claim because its allegation of an unwritten policy is conclusory and

implausible, and that the APA precludes review of OCR's enforcement decisions because those

determinations are committed to OCR's discretion.[2]  For the following reasons, Defendants'

Motion To Dismiss is granted.

I.  Background

A.  Factual Background

The following facts are derived from Plaintiff's Second Amended Complaint.  Although

the Court will sometimes refer to Plaintiff's contentions as "alleged," it accepts all allegations as

true for the purpose of deciding Defendants' Motion To Dismiss.  OCR received a complaint

against Plaintiff on February 23, 2011, alleging that Plaintiff "discriminated against

[complainant's] son . . . , a student at Ardsley High School and a member of the Ardsley [High

School] basketball team, on the basis of his race" by inadequately addressing an alleged

"incident of racial harassment" at a basketball game on February 18, 2011.  (Second Am. Compl.

---

[2] Defendants also previously moved to dismiss Plaintiff's substantive due process claim. (*See* Second Am. Compl. ¶ 52 (Dkt. No. 38) (alleging that the Letter of Findings "deprived the District of substantive due process in violation of the 5th Amendment").)  Plaintiff has since withdrawn its due process claim, (*see* Dkt. Nos. 54–55), so the Court will not address it further at this time.

¶¶ 6–7 (Dkt. No. 38).)  The complainant alleged that "a spectator . . . yelled a racial slur as the [complainant's son] came onto the basketball court to play."  (*Id.* ¶ 7.)

Plaintiff claims that it then commenced a "prompt and comprehensive investigation into the allegations made by the [c]omplainant," including interviews of 31 witnesses (among them students, staff, and coaches from the school district, along with staff from Ardsley High School, referees, and other individuals from the community), as well as review of a video recording of the game.  (*Id.* ¶ 8.)  Plaintiff states that "[n]one of the witnesses [interviewed] heard the alleged racial slur . . . and the slur could not be detected on the video recording," and claims that the investigation "revealed no credible evidence suggesting that an incident of racial harassment had occurred."  (*Id.* ¶ 9.)

OCR sent Plaintiff a letter on March 10, 2011 notifying Plaintiff that "it was opening an investigation regarding [the complainant's] allegation" "in accordance with its duties to enforce Title VI of the Civil Right Act of 1964 . . . and its implementing regulation[s] . . . , which prohibit discrimination on the basis of race, color or national origin in programs and activities receiving financial assistance from the U.S. Department of Education."  (*Id.* ¶ 10.)  The Second Amended Complaint includes excerpts of the letter:

> Please note that opening the allegation for investigation in no way implies that OCR has made a determination with regard to its merits.  During the investigation, OCR is a neutral fact-finder, collecting and analyzing relevant evidence from the complainant, the recipient, and other sources, as appropriate.  OCR will ensure that its investigation is legally sufficient and is dispositive of the allegations, in accordance with the provisions of Article III of OCR's *Case Processing Manual*.
>
> ***
>
> Also, when appropriate, a complaint may be resolved before the conclusion of investigation after the recipient expresses an interest to OCR to resolve the complaint.  In such cases, OCR obtains a resolution agreement signed by the recipient.  This agreement must be aligned with the complaint allegations or the

> information obtained during the investigation, and it must be consistent with
> applicable regulations.

(*Id.* (emphasis omitted).)

The letter also included "a copy of the OCR Complaint Processing Procedures," which

states:

> A complaint may also be resolved before the conclusion of the investigation, if the
> recipient expresses an interest in resolving the complaint.  If OCR determines that
> the resolution of the complaint before the conclusion of the investigation is
> appropriate, OCR will attempt to negotiate an agreement with the recipient.  OCR
> will notify the complainant of the recipient's request of the complaint and will keep
> the complainant informed throughout all stages of the resolution process.  The
> provisions of the resolution agreement that is reached must be aligned with the
> complaint allegations and the information obtained during the investigation, and
> must be consistent with applicable regulations.  A resolution agreement reached
> before the conclusion of the investigation will be monitored by OCR.
>
> If OCR determines that a recipient failed to comply with one of the civil rights laws
> that OCR enforces, OCR will contact the recipient and will attempt to secure the
> recipient's willingness to negotiate a voluntary resolution agreement.  If the
> recipient agrees to resolve the complaint, the recipient will negotiate and sign a
> written resolution agreement that describes the specific remedial actions that
> recipient will undertake to address the area(s) of noncompliance identified by OCR.
> The terms of the resolution agreement, if fully performed, will remedy the
> identified violation(s) in compliance with applicable civil rights laws.  OCR will
> monitor the recipient's implementation of the terms of the resolution agreement to
> verify that the remedial actions agreed to by the recipient have been implemented
> consistent with the terms of the agreement and that the area(s) of noncompliance
> identified were resolve [sic] consistent with applicable civil rights laws.
>
> If the recipient refuses to negotiate a voluntary resolution agreement or does not
> immediately indicate its willingness to negotiate, OCR will inform the recipient
> that it has 30 days to indicate its willingness to engage in negotiations to voluntarily
> resolve identified areas of noncompliance, or OCR will issue a Letter of Findings
> to the parties providing the factual and legal bases for a finding noncompliance
> [sic].

(*Id.* ¶¶ 11, 13 (emphasis omitted).)

Plaintiff then contacted OCR Compliance Team Investigator Geraldo Perez ("Mr. Perez")

to indicate Plaintiff was interested "in resolving the complaint through execution of a resolution

agreement in accordance with Sections 302 and 304 of the OCR Case Processing Manual" (the

"CPM"), despite Plaintiff's "strong belief that its comprehensive investigation yielded no

credible evidence suggesting that the alleged incident occurred." (*Id.* ¶¶ 14–15 (emphasis

omitted).)

Section 302 of the CPM ("Resolution Agreement Reached During an Investigation")

states in part:

> **Resolution Agreement Reached During an Investigation**
>
> A complaint may be resolved at any time when, before the conclusion of an investigation, the recipient expresses an interest in resolving the complaint. OCR should inform the recipient that this process is voluntary. OCR's determination that it is appropriate to resolve the complaint during the course of an investigation must be approved by the Office Director or designee. If approved, OCR will immediately notify the complainant of the recipient's interest in resolving the complaint and will keep the complainant informed throughout all stages of this resolution process. The provisions for the resolution agreement will be aligned with the complaint allegations or the information obtained during the investigation, and will be consistent with the applicable regulations. A copy of the resolution agreement will be included with the resolution letter. Resolution letters and agreements must be approved by the Chief Attorney or designee and the Office Director or designee, in consultation with the Enforcement Director. (See Section 304 regarding resolution agreements.)

(*Id.* ¶ 17.)

Section 304 of the CPM ("Guidelines for Resolution Agreements") also states in part:

> **Guidelines for Resolution Agreements**
>
> The complaint will be considered resolved and the recipient deemed compliant if the recipient enters into an agreement that, fully performed, will remedy the complaint (pursuant to Section 302) *or* identified violations (pursuant to Section 303). A copy of the agreement will be included with the resolution letter (if obtained during the investigation, pursuant to Section 302) or letter of finding(s) (if obtained after a compliance determination is made at the end of the investigation, pursuant to Section 303). Resolution agreement planning will be documented in the case file either separately or by reference to the resolution agreement.

(*Id.* ¶ 18 (emphasis omitted).)

On September 29, 2011, Plaintiff sent a copy of the proposed resolution agreement to the

three members of the OCR team that had been handling Plaintiff's case. (*Id.* ¶ 19.) Plaintiff also

5

included a challenge to one member's statement that one witness, Dr. Auriemma (Plaintiff's Superintendent of Schools), "had allegedly stated that three adults had communicated to him that they had heard a racial slur at the . . . basketball game." (*Id.*) Plaintiff notified OCR that Dr. Auriemma "had advised that he had never made any such statement and that such communications to him had, in fact, not occurred." (*Id.*) Another member told Plaintiff that OCR would review its notes from its interview of Dr. Auriemma; Plaintiff responded that Plaintiff's "Board of Education felt strongly that [Plaintiff] had done nothing wrong and was not prepared to agree to take action that would send a message that [Plaintiff] acknowledged having done anything wrong and made clear that [Plaintiff] would like to 'cooperatively resolve this matter.'" (*Id.* ¶¶ 20–21.)

On November 15, 2011, Plaintiff and OCR entered a Resolution Agreement to "resolve the compliance concerns" raised in the complaint. (*Id.* ¶ 22.) Plaintiff agreed to do the following:

> By November 30, 2011, [Plaintiff] will conduct further investigation to determine the source of the alleged racial slur made during the basketball game on February 18, 2011; including but not limited to, attempting to interview the complainant, the [complainant's son], and other witnesses identified by the complainant and the [complainant's son], and interviewing at least five additional student witnesses who were located in or near [Plaintiff's] student section during the game. If the investigation reveals the identity of the alleged harasser(s), [Plaintiff] will take prompt and effective steps reasonably calculated to end the harassment, and prevent the harassment from recurring. [Plaintiff] will notify the complainant of the outcome.

> By December 15, 2011, [Plaintiff] will provide OCR with a copy of the investigative report, including a description of any action taken if the investigation reveals the identity of the alleged harasser(s). Additionally, [Plaintiff] will provide OCR with documentation demonstrating that [Plaintiff] notified the complainant of the outcome of the investigation.

\*\*\*

6

By December 14[,] 2011, [Plaintiff] will review and revise, as necessary, its harassment policy and related grievance procedures to address complaints of harassment based on race, color and national origin. These procedures will provide for the prompt and equitable resolution of complaints of harassment based on race, color and national origin. The procedures will include at a minimum [a number of requirements described in the Resolution Agreement.]

\*\*\*

Once revised, [Plaintiff] will utilize its on-going training programs that raise awareness of the issue of harassment for staff and students, to ensure that staff and students are aware of these revised policies and procedures and the prohibition against racial harassment.

\*\*\*

By December 14, 2011, [Plaintiff] will provide its revised harassment policy and any related grievance procedures to OCR for review and concurrence.

Within fifteen (15) days of [Plaintiff's] receipt of OCR's concurrence with respect to the revised policy and any grievance procedures, [Plaintiff] will provide OCR with documentation to substantiate that it has formally adopted the revised policy and procedures; updated its printed publications and on-line publications with the revised policy and procedures (inserts may be used pending reprinting of these publications in the 2012–13 school year); electronically disseminated the revised policy and grievance procedures to those high school students, parents, and . . . staff that [Plaintiff] has e-mails for, and mailed copies of the revised Code of Conduct pages to high school parents. This documentation will include at a minimum (i) printouts or a link to all on-line publications containing the revised policy and grievance procedures; (ii) evidence of the electronic dissemination of the revised policy and grievance procedures to high school students, parents and . . . staff, as described [in the Resolution Agreement]; and (iii) if not yet finalized, copies of inserts for printed publications.

By January 1, 2012, [Plaintiff] will provide to OCR copies of the printed versions of all publications disseminated to high school students, parents, and . . . staff containing the revised policy and grievance procedures.

(Affirmation of Michael K. Lambert, Esq. in Opp'n to Defs.' Mot. To Dismiss the Compl. Ex. I

(the "Resolution Agreement") 1–3 (Dkt. No. 12) (headings omitted).)[3]

---

[3] Plaintiff's Second Amended Complaint provides a synopsis of the Resolution Agreement; the excerpts above are direct quotes from the Resolution Agreement rather than the complaint. (*See* Second Am. Compl. ¶ 26.) "In ruling on a 12(b)(6) motion, . . . a court may

Plaintiff also acknowledged that it understood

that OCR will not close the monitoring of this agreement until OCR determines that the recipient has fulfilled the terms of this agreement and is in compliance with the regulation . . . at issue . . . [,] [that] by signing this agreement, [Plaintiff] agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this agreement . . . [,] [that] during the monitoring of this agreement, if necessary, OCR may visit [Plaintiff], interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether [Plaintiff] has fulfilled the terms of this agreement and is in compliance with the regulation . . . at issue . . . [,] [and that entering into the Resolution Agreement] does not constitute an admission that [Plaintiff] has committed any violation of Title VI or its implementing regulations.  Nor does execution of [the] Resolution Agreement constitute any admission of other wrongdoing by [Plaintiff].

(*Id.* at 3.)

Plaintiff alleges that on November 17, 2011, two days after Plaintiff entered the Resolution Agreement, OCR issued a Letter of Findings.  (*See* Second Am. Compl. ¶ 28.) Plaintiff alleges that the Letter of Findings was issued pursuant to a policy of OCR of, contrary to the provisions of the Department of Education's Case Processing Manual, "issuing . . . adverse finding [sic] letters after entering into resolution agreements with the subject of complaints," and that this is particularly true "when its investigators have expended what it considers to be substantial time and/or resources in the investigation of a complaint, whether or not it has

---

consider the complaint as well as . . . any statements or documents incorporated in it by reference."  *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014); *see also Jiaxing Hongyu Knitting Co. v. Allison Morgan LLC*, No. 11-CV-9342, 2013 WL 81320, at *6 (S.D.N.Y. Jan. 8, 2013) ("If the documentary exhibits attached to a complaint contradict the allegations of the complaint, those allegations may be insufficient to defeat a motion to dismiss." (internal quotation marks omitted)); *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012) (same).  Plaintiff sent the Court a copy of the Resolution Agreement and included it as an exhibit to Plaintiff's affirmation in opposition to Defendants' first Motion To Dismiss.  (*See* Affirmation of Michael K. Lambert, Esq. in Opp'n to Defs.' Mot. To Dismiss the Compl. Ex. I (Dkt. No. 12).)

actually completed its investigation before the resolution agreement was entered into." (Second

Am. Compl. ¶¶ 29, 49, 50.)  The Letter of Findings included the following provisions:

> OCR determined that there was sufficient evidence to conclude that the incident occurred as alleged.  OCR further determined that [Plaintiff] had actual notice of the incident and promptly investigated the incident; however, OCR determined that [Plaintiff's] investigation was incomplete and insufficient.  Specifically, [Plaintiff] did not attempt to interview more than three students to determine the source of the slur, even though [Plaintiff] was advised that the slur originated from the section of the bleachers where [Plaintiff's] students were seated.  Further, [Plaintiff] did not interview the complainant, the [complainant's son], or any of the witnesses who advised [Plaintiff] that they heard the racial slur, and could have provided more information to assist [Plaintiff] in identifying the source of the slur.
>
> [Plaintiff] executed the . . . Resolution Agreement to resolve this complaint.  OCR will monitor [Plaintiff's] implementation of the Resolution Agreement.  Please be advised that if [Plaintiff] fails to comply with its terms, OCR will resume its investigation of this complaint.
>
> This letter sets forth OCR's determination in an individual OCR case.  This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

(Decl. of Ellen Blain in Supp. of Mot. To Dismiss Ex. A ("Letter of Findings"), at 1–4 (Dkt. No.

32).)

On November 20, 2011, Plaintiff requested that OCR "recall[], rescind[] and otherwise

repudiate[]" the Letter of Findings and close the case because of the Resolution Agreement.

(Second Am. Compl. ¶ 37.)  Although OCR did ultimately close the case on March 6, 2012, it

did not otherwise comply with Plaintiff's requests.  (*Id.* ¶¶ 40–41.)

Plaintiff claims that it has suffered "profound embarrassment" from the issuance of the

"defamatory" Letter of Findings and that its "reputation for being efficient, fair-minded and race-

neutral" has been "degraded."  (*Id.* ¶ 44.)  Plaintiff notes that OCR made the text of the Letter of

Findings available to the public and gave it to the complainant as well, (*id.* ¶ 43), and asserts that

the determinations in the Letter of Findings were "arbitrary, capricious, an abuse of discretion, . . . without the observance of the procedures required by law and otherwise not in accordance with law and should be set aside by this Court" under the APA, (*id.* ¶ 50).

B.  Procedural Background

Plaintiff filed its original Complaint on April 13, 2012.  (*See* Dkt. No. 1.)  On January 4, 2013, Defendants filed a Motion To Dismiss, in which they argued that because the Letter of Findings was not "final agency action," the APA precluded its review.  (*See* Dkt. Nos. 9–11.) Plaintiff filed its Opposition to Defendants' Motion on January 23, 2013, (*see* Dkt. Nos. 12–13), to which Defendants replied on March 15, 2013, (*see* Dkt. No. 15).

However, before the Court decided Defendants' Motion, it issued an Order, in keeping with its independent obligation to consider the presence or absence of subject matter jurisdiction, directing the Parties to "file supplemental briefs with the Court addressing the issue of Plaintiff's standing."  (Order 2 (Dkt. No. 16).)  Following the Parties' submission of responsive memoranda, the Court issued a second Order:

> In its supplemental brief on standing, Plaintiff focused on establishing that the reputational injury [that it allegedly suffered] qualifies as an injury in fact for purposes of establishing [Plaintiff's] standing to challenge . . . Defendants' action through the instant case, and Plaintiff asserted no other basis for standing. However, Plaintiff's Complaint does not include any allegations with respect to reputation.  A plaintiff may not rely on an unpled injury to establish standing. Accordingly, because the Complaint includes no allegations of reputational injury, or any other injury in fact, the Court finds that Plaintiff has failed to meet its burden of establishing standing.
>
> However, the Court notes that in certain circumstances, reputational injury may be sufficient to establish standing.
>
> Therefore, the Complaint is dismissed without prejudice, and Plaintiff is granted leave to file an amended complaint alleging an injury . . . .  Because the Court has dismissed the Complaint on standing grounds, Defendants' motion to dismiss on the basis of APA finality is moot and denied without prejudice.

10

(Order 2–3 (alterations, citations, and internal quotation marks omitted) (Dkt. No. 19).)  Pursuant

to this Order, Plaintiff filed an Amended Complaint on June 20, 2013.  (*See* Dkt. No. 20.)

Defendants filed a second Motion To Dismiss on September 23, 2013, (*see* Dkt. Nos.

30–32), to which Plaintiff responded the following day, (*see* Dkt. No. 33).  Defendants then

replied on October 30, 2013, (*see* Dkt. No. 36), at which point Defendants' Motion was fully

submitted.  The Court held oral argument on August 7, 2014.  The Court then issued a third

Order:

> The Court finds that Plaintiff has standing, but that the APA precludes this Court's
> review of Plaintiff's APA claims, as OCR's issuance of the Letter of Findings was
> not a final agency action, and no exception to the APA's finality requirement
> applies.  However, because this result was dictated in part by deficiencies in
> Plaintiff's Amended Complaint, Plaintiff will be given one final opportunity to
> amend . . . .  Should Plaintiff fail to [file a Second Amended Complaint within 30
> days of the issuance of this Opinion], the Court will dismiss its APA claims with
> prejudice.

(Am. Op. & Order 68 (Dkt. No. 57) (alterations, citations, and internal quotation marks

omitted).)  The Court also noted that "Plaintiff's due-process claims may be vulnerable to attack"

because "the only asserted basis for Plaintiff's standing in this Action is the reputational harm

that it allegedly suffered . . . [b]ut . . . [a] person's interest in his or her good reputation alone,

apart from a more tangible interest, is not . . . sufficient to invoke the procedural protections of

the Due Process Clause."  (*Id.* at 67 n.16 (internal quotation marks omitted).)  However, the

Court concluded that "because Defendants did not raise this issue in their Memorandum of Law,

the Court will not rule on it at this time."  (*Id.*)  Pursuant to this Order, Plaintiff filed a Second

Amended Complaint on September 29, 2014.  (*See* Dkt. No. 38.)  Defendants filed another

Motion To Dismiss on March 2, 2015.  (*See* Dkt. Nos. 49–50.)  Plaintiff requested permission to

withdraw its due process claim on April 15, 2015, (*see* Dkt. No. 54); this claim was dismissed by

the Court on April 16, 2015, (*see* Dkt. No. 55).  Plaintiff then responded to Defendants' Motion

To Dismiss regarding the first claim for relief under the APA on April 21, 2015.  (*See* Dkt. No. 56.)  Defendants responded on May 8, 2015.  (*See* Dkt. No. 58.)

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss Plaintiff's Second Amended Complaint on three separate grounds.[4]  First, they argue that Plaintiff fails to allege that OCR has an illegal policy or to seek relief from such a policy.  Relatedly, they argue that Plaintiff's claims that are based on the contents of the Letter of Findings should be disregarded because the Letter of Findings does not constitute final agency action and is therefore not subject to judicial review.  (*See* Defs.' Mem. in Supp. of Mot. To Dismiss ("Defs.' Mem.") 11–12.)  Defendants ground this argument in APA § 704, which states that "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review," but that "[a] preliminary, procedural, or intermediate agency action or ruling" is subject to challenge only "on the review of the final agency action." 5 U.S.C. § 704; *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007) ("The federal courts ordinarily are empowered to review only an agency's *final* action . . . ."); *Shakhnes v. Berlin*, 689 F.3d 244, 260 (2d Cir. 2012) ("Under the Administrative Procedure Act, courts may not review agency actions unless such actions are 'final.'" (citation omitted)).

---

[4] As previously noted, Defendants also initially moved to dismiss Plaintiff's substantive due process claim.  (*See* Second Am. Compl. ¶ 52 (alleging that the Letter of Findings "deprived the District of substantive due process in violation of the 5th [sic] Amendment")).  Because Plaintiff has since withdrawn the claim, (*see* Dkt. Nos. 54–55), the Court will not address it further here.

Second, Defendants argue that Plaintiff's claim that OCR has an arbitrary and capricious unwritten policy of issuing Letters of Findings before completing an investigation is based on conclusory and implausible allegations, and so should be dismissed under Rule 12(b)(6) for failure to adequately state a claim.  (*See* Defs.' Mem. 12–17.)

Third, Defendants argue that Plaintiff's claim that OCR's policy (as codified in the CPM) of issuing Letters of Findings after completing an investigation and entering a resolution agreement is arbitrary and capricious should be dismissed under Rule 12(b)(1) because the Department's policy choices regarding enforcement procedures are committed to agency discretion by law.  Those policy choices, Defendants claim, are therefore not subject to judicial review under the APA per § 701(a)(2).  (*See id.* at 17–22.)

The Court concluded in its prior Opinion that the APA's finality requirement is not jurisdictional in nature, but rather an element of a claim for relief under the APA, and is therefore subject to the Rule 12(b)(6) standard rather than the 12(b)(1) standard.  (*See* Am. Op. & Order 14–15 ("Although the Second Circuit has not yet definitely resolved this issue, the better view appears to be that the requirement is not jurisdictional in nature, but is instead merely an essential element of an APA claim for relief.  *See Sharkey* [*v. Quarantillo*], 541 F.3d [75,] 87 n.10 [(2d Cir. 2008)] (collecting cases from the First, Fourth, Sixth, and D.C. Circuits holding or suggesting that the finality requirement is not jurisdictional).")  In contrast, the Court analyzes Defendants' § 701(a)(2) arguments as a jurisdictional issue.  *See, e.g.*, *Lunney v. United States*, 319 F.3d 550, 557–58 (2d Cir. 2003) (noting that, because "[t]he APA is not an independent grant of subject matter jurisdiction," but "[r]ather . . . waives the federal government's sovereign immunity in actions brought under the general federal question jurisdictional statute," "there is no jurisdiction if the statute or regulation said to govern the challenged agency action is drawn so

that a court would have no meaningful standard against which to judge the agency's exercise of discretion" (emphasis and internal quotation marks omitted)); *see also Tomsha v. Gen. Servs. Admin.*, No. 15-CV-7326, 2016 WL 3538380, at *4 (S.D.N.Y. June 21, 2016) ("[T]he Court cannot exercise subject-matter jurisdiction over a claim if § 701(a)(2) precludes judicial review of the relevant decision under the APA." (alterations and internal quotation marks omitted)). Accordingly, Defendants' third claim should be evaluated under the standard of review applicable to motions brought under Rule 12(b)(1), and Defendants' first and second claims should be evaluated under the standard of review applicable to motions brought under Rule 12(b)(6).[5]  The Court will lay out the standards of review for motions brought under both rules, noting that Plaintiff bears the burden under Rule 12(b)(1), but that Defendants bear the burden under Rule 12(b)(6).

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint."  *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted).  "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010).  While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting

---

[5] As the Court also noted in its prior Opinion, the standards under Rule 12(b)(1) and 12(b)(6) are "substantively identical," so the difference is slight and only impacts the question of which party bears the burden of proof.  (Am. Op. & Order 15.)

jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alterations and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2.  Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alterations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

　　"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (internal quotation marks and alterations omitted)).  Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44

16

n. 1 (2d Cir. 2014) (citation, internal quotation marks, and some alterations omitted); *see also*

*Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule

12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the

complaint, in documents appended to the complaint or incorporated in the complaint by

reference, and to matters of which judicial notice may be taken." (internal quotation marks

omitted)); *Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y.

Dec. 20, 2013) (same).

    B.  Analysis

Defendants move to dismiss the Second Amended Complaint because Plaintiff (1) fails to

allege that OCR has an illegal policy, fails to seek relief from such a policy, and relies on the

content of the Letter of Findings, which is not subject to judicial review; (2) fails to state a claim

regarding its allegation that OCR has an arbitrary and capricious unwritten policy of issuing

Letters of Findings before completing an investigation; and (3) fails to establish subject matter

jurisdiction over OCR's policy (as codified in the CPM) of issuing Letters of Findings after

completing an investigation and entering a resolution agreement, because that policy decision is

committed to agency discretion.  Because the third contention "goes to the power of the [C]ourt

to hear and decide the case," *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,

813 F.3d 98, 114 n.8 (2d Cir. 2016), *pet. for cert. filed*, No. 16-201 (Aug. 12, 2016), the Court's

analysis begins there.  Afterward, if the Court has jurisdiction, it will consider whether Plaintiff

has plausibly alleged final agency action capable of judicial review in the form of either (1) the

Letter of Findings or (2) an unwritten policy of issuing Letter of Findings before completing an

investigation.

### 1.  Whether OCR's Procedures Are Committed To Agency Discretion

As noted, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704. However, this provision does not apply where the "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  According to Defendant, such is the case here.  (*See* Defs.' Mem. 18–22.)

In general, "[t]here is a strong presumption favoring judicial review of administrative action."  *Salazar v. King*, 822 F.3d 61, 75 (2d Cir. 2016) (citing, inter alia, *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015)); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (noting "the strong presumption that Congress intends judicial review of administrative action").[6]  Indeed, "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."  *Bowen*, 476 U.S. at 670.  However, the exception for "agency action . . . committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is triggered where "there is no law to apply," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation marks omitted), *overruled on other grounds by Califano v. Sanders*,

---

[6] Here, as elsewhere, the Court cites relevant authority decided after the Parties' briefing of the instant Motion.  Nevertheless, that authority did not meaningfully change the landscape of administrative law and deals with issues briefed by the Parties.  It is therefore appropriate to consider.  *See, e.g.*, *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-CV-7096, 2015 WL 4163343, at *3 n.5 (S.D.N.Y. July 10, 2015) (considering a New York Court of Appeals decision even though it was decided "after briefing was complete in th[e] case," where "[t]he [Court of Appeals] decision . . . affirmed a substantial body of case law" reaching a particular conclusion); *cf. also Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 215 (2d Cir. 2010) (applying a Second Circuit decision even where it post-dated the facts at issue in the pending case, reasoning that "a rule applied to the parties in a case before the Court 'is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule'" (quoting *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993))).

430 U.S. 99, 105 (1977); *see also Westchester v. U.S. Dep't of Hous. & Urban Dev.*, 778 F.3d

412, 419 (2d Cir. 2015) ("Th[e] exception to the availability of judicial review [found in

§ 701(a)(2)] 'applies only in those rare instances where statutes are drawn in such broad terms

that in a given case there is no law to apply.'" (quoting *Sharkey*, 541 F.3d at 91)).  This will be

so when "no judicially manageable standards are available for judging how and when an agency

should exercise its discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see also Tomsha*,

2016 WL 3538380, at *4 ("Section 701(a)(2) bars judicial review of claims only if there is no

law to apply, such that there is no meaningful standard against which to judge the agency's

exercise of discretion." (citation and internal quotation marks omitted)).  "To determine whether

there is 'law to apply' that provides 'judicially manageable standards' for judging an agency's

exercise of discretion, the courts look to the statutory text, the agency's regulations, and informal

agency guidance that govern the agency's challenged action."  *Salazar*, 822 F.3d at 76 (citing

*Westchester*, 778 F.3d at 419; *Chaney*, 470 U.S. at 830).  "Agency regulations and guidance can

provide a court with law to apply because, 'as the Supreme Court noted where the rights of

individuals are affected, it is incumbent upon agencies to follow their own procedures.  This is so

even where the internal procedures are possibly more rigorous than otherwise would be

required.'"  *Id.* (alteration and some internal quotation marks omitted) (quoting *Montilla v.

I.N.S.*, 926 F.2d 162, 167 (2d Cir. 1991)); *see also GoJet Airlines, LLC v. F.A.A.*, 743 F.3d 1168,

1173 (8th Cir. 2014) (noting that the "narrow presumption of unreviewability" found in

§ 701(a)(2) "does not apply if . . . the agency has made clear its intent that a policy statement or

set of enforcement guidelines impose binding limitations on the exercise of its enforcement

discretion," and further noting that, in applying this standard, it is relevant whether the agency

policy or procedural rule at issue is "intended primarily to confer important procedural benefits

upon individuals in the face of otherwise unfettered discretion." (internal quotation marks

omitted)); *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 158–59 (D.C. Cir. 2006)

(noting that "judicially manageable standards may be found in formal and informal policy

statements and regulations as well as in statutes," but cautioning that, "in determining whether

agency statements create such a standard, the operative question is whether the statements create

binding norms" (internal quotation marks omitted)); *Spencer Enters., Inc. v. United States*, 345

F.3d 683, 688 (9th Cir. 2003) ("Even where statutory language grants an agency unfettered

discretion, its decision may nonetheless be reviewed if regulations or agency practice provide a

meaningful standard by which this court may review its exercise of discretion." (alteration and

internal quotation marks omitted)); *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1027–28 (8th

Cir. 2003) (treating as "law to apply" for purposes of 5 U.S.C. § 701(a)(2) the Army Corps of

Engineers' *Missouri River Main Stem Reservoir System Reservoir Regulation Manual*, which

"set[] out priorities and direct[ed] the Corps to take certain actions in given situations," and was

"binding on the Corps because it set[] out substantive requirements, and [because] its language

and context indicate that it was intended to bind the Corps's discretion").

      Therefore, in its hunt for "law to apply," *Citizens to Pres. Overton Park*, 401 U.S. at 410,

the Court begins with "the statutory text," *Salazar*, 822 F.3d at 76.  Here, as alleged, the

Department's letter indicated that its actions were undertaken pursuant to "its duties to enforce

Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d et seq., . . . and its

implementing regulation at 34 C.F.R. Part 100 . . . ."  (Second Am. Compl. ¶ 10.)  Under 42

U.S.C. § 2000d, "[n]o person in the United States shall, on the ground of race, color, or national

origin, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance," an

aspiration given legal teeth through another Title VI provision that "authorize[s] and direct[s]" "[e]ach Federal department and agency which is empowered to extend [certain] financial assistance to any program or activity . . . to effectuate" the foregoing provision, among others, "with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken," 42 U.S.C. § 2000d-1.  More specifically, the statute provides two mechanisms by which "[c]ompliance with any requirement adopted pursuant to this section may be effected," specifically (1) "by the termination of or refusal to grant or to continue assistance under [the relevant] program or activity," subject to certain limitations, or (2) "by any other means authorized by law," subject, again, to certain other limitations.  *Id.*  Because the Department's actions in this case plainly were not the former, the inquiry becomes whether there is "law to apply," *Citizens to Pres. Overton Park*, 401 U.S. at 410, to the question of whether the Department's "means [were] authorized by law," 42 U.S.C. § 2000d-1.[7]

---

[7] One passing point: Title VI provides that "[a]ny department or agency action taken pursuant to section 2000d-1 . . . shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds," and, in an apparent reference to the first mechanism for ensuring compliance found in § 2000d-1, also indicates that "[i]n the case of action, not otherwise subject to judicial review, *terminating or refusing to grant or to continue financial assistance* upon a finding of failure to comply with any requirement imposed pursuant to [§] 2000d-1 . . . , any person aggrieved . . . may obtain judicial review of such action in accordance with" the judicial review procedures of the APA, "and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that chapter."  42 U.S.C. § 2000d-2 (emphasis added).  A textual argument could be made that, by expressly noting that compliance mechanism #1 (i.e., withholding financial assistance) was not "deemed committed to unreviewable agency discretion within the meaning of that chapter," *id.*, Congress insinuated that procedures adopted to compliance mechanism #2 (i.e., any other means authorized by law) may well be unreviewable, either because it is committed to agency discretion or because § 2000d-2 through this language "preclude[d] judicial review," 5 U.S.C. § 701(a)(1).  However, "[a]s a general matter, the mere fact that some acts are made reviewable

From there, the analysis naturally shifts to the regulations.  Under the heading of a provision of the regulations fittingly entitled "[c]onduct of investigations," *see* 34 C.F.R. § 100.7, whenever a complaint  "indicates a possible failure to comply with" those rules that, per 34 C.F.R. § 100.1, are meant to effectuate the purposes of Title VI, "[t]he responsible Department official or his designee will make a prompt investigation," which "should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part," *see id.* § 100.7(c).  Where such an investigation pursuant to this regulation "indicates a failure to comply with this part, the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible," *id.* § 100.7(d)(1); however, where the investigation "does not warrant action . . . [,] the responsible Department official or his designee will so inform the recipient and the complainant, if any, in writing," *id.* § 100.7(d)(2).

Whether these foregoing principles amount to "law to apply," *Citizens to Pres. Overton Park*, 401 U.S. at 410, depends on where the putative "agency action" (that may be or may not be "committed to agency discretion by law") is to be found.  5 U.S.C. § 701(a)(2).  More specifically, the Parties' submissions seem to conceptualize the challenged action as either the timing of *this* Letter of Findings in the context of this investigation, (*see* Pl.'s Opp'n 15 (arguing that Defendants' alleged failure to abide by procedural rules that they adopt "may be overturned as arbitrary, capricious or an abuse of discretion under the APA")), or a broader policy of issuing

should not suffice to support an implication of exclusion as to others."  *Bowen*, 476 U.S. at 674 (alteration and internal quotation marks omitted).

Letters of Findings after voluntarily resolving a case, pursuant to which the action in this case was taken, (*see* Defs.' Mem. 21 (arguing that "the Court lacks jurisdiction to review OCR's *policy*" in part "[b]ecause OCR has wide discretion to fashion its own procedural rules and policies with regard to the timing of issuance of Findings Letters when an investigation indicates a failure to comply with Title VI")).

To the extent that the former is the challenged option, the Court has "judicially manageable standards" guiding "how and when [the Department] should exercise its discretion." *Chaney*, 470 U.S. at 830. Indeed, the regulations provide specific guidance as to how the responsible Department official is to conduct "[i]nvestigations" and oversee "[r]esolution of matters." *See* 34 C.F.R. § 100.7. By way of just one example, it may be argued that the Department's putative failure to interview players who attended the game, (*see* Second Am. Compl. ¶ 34), betrayed its failure to appropriately consider "the circumstances under which the possible noncompliance with this part occurred," *see* 34 C.F.R. § 100.7(c). Judging the propriety of agency action in light of the relevant rules in place is appropriate work for a court, agency expertise notwithstanding. *Cf. Ethyl Corp. v. Envtl. Prot. Agency*, 541 F.2d 1, 68 (D.C. Cir. 1976) (Leventhal, J., concurring) (arguing that, "[i]n the case of agency decision-making[,] . . . Congress has been willing to delegate its legislative powers broadly and courts have upheld such delegation because there is court review to assure that the agency exercises the delegated power within statutory limits, and that it fleshes out objectives within those limits by an administration that is not irrational or discriminatory" (footnote omitted)). Moreover, OCR's Complaint Processing Procedures and Case Processing Manual provide guidelines for resolution agreements as well as guidance as to the resolution of a complaint prior to the conclusion of an investigation, during an investigation, and after a determination of noncompliance. (*See* Second

Am. Compl. ¶¶ 11, 13, 16–17.)  This "[a]gency . . . guidance can provide a court with law to apply," *Salazar*, 822 F.3d at 76, and, for what it may be worth, looks to have "create[d] binding norms," *Twentymile Coal Co.*, 456 F.3d at 159 (internal quotation marks omitted), as to how OCR conducts investigations.  Therefore, at bottom, there is "law to apply."  *Citizens to Pres. Overton Park*, 401 U.S. at 410.[8]

If, however, the relevant agency action at issue is not this letter, but rather the *adoption* of a policy of issuing Letters of Findings after voluntary resolution of a case, matters become more interesting.  In support of their argument that the Court lacks subject matter jurisdiction, Defendants invoke the Supreme Court's decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 519 (1978).  As Defendants correctly note, (*see* Defs.' Mem. 19–20), in that case, the Supreme Court, acknowledging the benefits of agency expertise, cautioned courts against imposing new procedural requirements where the agencies did not adopt such restrictions themselves, *see Vt. Yankee*, 435 U.S. at 524 ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.").  To the extent that Plaintiff's position is, in fact, that no agency rule barred the issuance of a Letter of Findings before resolution of an investigation, but that one should have, it would run afoul of *Vermont Yankee*.

But the Court does not think that is what Plaintiff is arguing.  Rather, Plaintiff takes issue not with Defendants' failure to take worthwhile action, but rather its decision to take allegedly

---

[8] Of course, such a line of argumentation might be inconsistent with the Court's holding in its prior opinion.  (*See* Am. Op. & Order 49 (noting that "not only [did] Plaintiff fail to allege in its Amended Complaint that it is challenging any OCR policy—Plaintiff actually appear[ed] to allege that OCR's issuance of the Letter of Findings was wrongful in part because it *violated* OCR policy").)

improper action.  To the extent that Plaintiff's position is that Defendants reversed course and silently shelved its prior approach to resolving matters and, instead, adopted a policy of issuing Letters of Finding in circumstances such as these, there is little question that federal courts regularly interdict such conduct.  *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."); *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 557 (D.C. Cir. 2015) (noting "the doctrine requiring agencies to give reasons before they rescind rules").  And while Defendants have forcefully argued that agencies' decisions to adopt rules of procedures are matters with which courts traditionally do not interfere, (*see* Defs.' Mem. 18–22), that principle does not counsel the same level of forbearance when an agency changes rules, *see State Farm*, 463 U.S. at 42.  Defendant has provided no reason, and the Court is not aware of any, why such a decision would be committed to its discretion within the meaning of § 701(a)(2) despite the ordinary proscription of an agency's unprincipled, unexplained change of rules.  Absent some basis to so conclude, the Court will not second-guess the otherwise self-evident conclusion that Plaintiff has established that subject matter jurisdiction exists.  *See Tandon*, 752 F.3d at 243.

## 2.  Was The Letter of Findings Final Agency Action?

Next, Defendants argue that Plaintiff's challenge to OCR's letter is not final agency action for the same reasons identified in the Court's prior Opinion, (*see* Defs.' Mem. 11–12),

and, to the extent that Plaintiffs are now challenging a policy of issuing letters, its claim is hopelessly implausible, (*see id.* at 12–17).

To begin, there are "two conditions that generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (internal quotation marks omitted); *see also Salazar*, 822 F.3d at 82 (same). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Hawkes*, 136 S. Ct. at 1813 (internal quotation marks omitted); *see also Salazar*, 822 F.3d at 82 (same). The second prong will be satisfied where the agency's action "gives rise to 'direct and appreciable legal consequences.'" *Hawkes*, 136 S. Ct. at 1814 (quoting *Bennett v Spear*, 520 U.S. 154, 178 (1997)).

In its prior Opinion, the Court found that because OCR's issuance of the Letter of Findings failed the second prong of the finality test, it was unnecessary to address the first prong (although the Court noted that it seemed unlikely that that action would satisfy the first prong regardless). (Am. Op. & Order 41–42 & n.8.) The Court acknowledged that although the Letter of Findings did not qualify as final agency action, a potential policy of issuing Letters of Finding despite previously entering into resolution agreements might constitute a "determination of rights or obligations," and therefore might fulfill the second prong of the finality test. (*Id.* at 47–48 (citing *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("Adopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process,' and 'one by which [the submitter's] rights [and the agency's] obligations have been determined.'" (alterations in

26

original)))).)  The Letter of Findings makes clear that the letter itself "is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public." (Letter of Findings 3–4.)  As a result, the Court indicated that Plaintiff would need to allege a separate policy outside the bounds of the Letter of Findings at issue to sufficiently state a reviewable claim involving final agency action.

The Court adheres to its earlier decision.  "The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) (alteration and internal quotation marks omitted)), and, accordingly, courts should "be loathe to [revisit earlier decisions] in the absence of extraordinary circumstances," *Knox v. Countrywide Bank*, No. 13-CV-3789, 2015 WL 5254519, at *5 (E.D.N.Y. July 29, 2015) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)), *adopted by* 2015 WL 5285738 (Sept. 9, 2015), *appeal filed*, No. 16-155 (Jan. 15, 2016).  Here, there is no reason to revisit the Court's prior holding.  Simply put, not every letter from an administrative agency articulating its views qualifies as final agency action, *see, e.g.*, *Pebble Ltd. P'ship v. U.S. E.P.A.*, 604 F. App'x 623, 625 (9th Cir. 2015) (finding a letter from the EPA regional administrator announcing the commencement of review proceedings under § 404(c) of the Clean Water Act to fulfill neither prong of the final agency action test); *Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 91, 96–97 (2d Cir. 2013) (finding no final reviewable agency action in a letter indicating that the FAA agreed with an expert panel's finding that New York City's plan to reopen a particular coastal garbage transfer facility would be compatible with safe air operations as long as several recommendations were followed); *Jallali v. Sec'y, U.S. Dep't of Educ.*, 437 F.

App'x 862, 865 (11th Cir. 2011) (per curiam) (finding no final agency action in a Department of Education letter informing a student that it did not have authority to provide the requested relief in connection with a complaint), and Plaintiff has provided no basis for the Court to revisit its earlier conclusion.

Of course, the Court also provided Plaintiff with an opportunity to amend its Complaint one additional time to include allegations that, in issuing the Letter of Findings, Defendants acted pursuant to a policy to be challenged.  (*Id.* at 50, 68.)  To that end, Plaintiff's Second Amended Complaint submitted pursuant to that instruction contains three additions:

> The issuance by OCR of the Letter of Findings was made pursuant to a policy the Department has adopted of OCR issuing such adverse finding [sic] letters after entering into resolution agreements with the subject of complaints, particularly when its investigators have expended what it considers to be substantial time and/or resources in the investigation of a complaint, whether or not it has actually completed its investigation before the resolution agreement was entered into.
>
> . . . .
>
> The determinations . . . in the Letter of Findings . . . [were] based upon a policy established by the Department of issuing adverse finding [sic] letters to subjects of complaints even after resolution agreements have been entered into by such subjects, particularly where OCR has expended what it considers to be substantial time and/or resources in the investigation of a complaint, whether or not it has actually completed its investigation before the resolution agreement was entered into.
>
> . . . .
>
> The . . . determinations . . . in the Letter of Findings . . . [were] the result of a policy adopted by the Department that is inconsistent with its own Case Processing Manual . . . .

(Second Am. Compl. ¶¶ 29, 49, 50.)

These three additional notations do not sufficiently allege that OCR issues Letters of Findings prior to completion of investigations as a matter of policy, outside the realm of this particular case.  Simply put, these new allegations are classic conclusory statements.  Just as it is

too conclusory, in a complaint seeking relief under a statute proscribing actions taken pursuant to a conspiracy, to posit that a conspiracy existed where the conduct described was "consistent with conspiracy, but just as much in line with a wide swath of [other] rational and competitive business strategy," *see Twombly*, 550 U.S. at 553–54, or to allege, in a case where relief ultimately turns on showing "that [government actors] adopted a policy because of, not merely in spite of, its adverse effects upon an identifiable group," that officials took actions "as a matter of policy, solely on account of [certain proscribed bases]," *Iqbal*, 556 U.S. at 680–81 (internal quotation marks omitted), so, too, is it equally unsatisfactory here to try to meet the requirements of 5 U.S.C. § 704 by alleging without further factual support that a policy was adopted, *cf. Means v. City of New York*, No. 15-CV-4855, 2016 WL 1337278, at *3 (S.D.N.Y. Apr. 5, 2016) (noting in context of claim brought pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that "[c]onclusory allegations that a non-supervisory official 'acted pursuant to a "policy," without any facts suggesting the policy's existence, are plainly insufficient.'" (quoting *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009)).

Indeed, this is not a case where a policy of some kind was plainly adopted and illuminated, albeit imperfectly, by an agency's manual, *cf. Venetian Casino Resort*, 530 F.3d at 931; rather, at best, Plaintiff has alleged that Defendants took certain action with respect to it and asks the Court to surmise therefrom the existence of a broader policy.  That is, however, not enough for purposes of § 704.  *See Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) ("Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the [defendant government agency's] practices.  But a final agency action requires more.").  In this respect, Plaintiff's case is particularly infirm because, even if Plaintiff's allegations established that a policy existed, the Second Amended Complaint is simply bereft of allegations

related to its *adoption*. *Compare Venetian Casino Resort*, 530 F.3d at 931 ("Adopting a policy of permitting employees to disclose confidential information without notice is surely [final agency action]."), *with Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Because an on-going program or policy is not, in itself, a 'final agency action' under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior." (some internal quotation marks omitted)). To the contrary, although the Second Amended Complaint states that OCR's alleged unwritten policy exists, it provides no indication as to why Plaintiff draws that conclusion, and, even upon elaboration in its Memorandum of Law, Plaintiff asserts only that "it is a reasonable inference to draw from these facts [in the current case] that . . . the defendant's [sic] decision to issue the Letter of Findings was based upon a policy or practice established by OCR . . . ." (Pl.'s Opp'n 9.) In short, "[Defendants'] alleged 'policy' of issuing [Letter of Findings after resolution agreements have been entered into] is found in no authoritative text, and is instead a generalized complaint about agency behavior that gives rise to no cause of action." *Bark*, 37 F. Supp. 3d at 51.

## III. Conclusion

Accordingly, Defendants' Motion To Dismiss is granted. The Clerk is respectfully directed to terminate the pending Motion, (*see* Dkt. No. 49), and to close this case.

SO ORDERED.

Dated:     October 5 , 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

30